# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Donath*, 2013 IL App (3d) 120251

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, v. BRAD L. DONATH, Respondent-Appellant. |
| District & No. | Third District<br>Docket No. 3-12-0251 |
| Rule 23 Order filed<br>Motion to publish<br>allowed<br>Opinion filed | February 21, 2013<br><br>March 22, 2013<br>March 22, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The denial of respondent's application for conditional release from the adjudication that he was a sexually dangerous person was not against the manifest weight of the evidence, regardless of the 12 years he had spent in treatment, since the record showed he had not successfully resolved his sexual preoccupation or the issues that predisposed him to reoffend. |
| Decision Under Review | Appeal from the Circuit Court of Tazewell County, Nos. 99-CF-129, 99-CF-130, 99-CF-131; the Hon. Scott A. Shore, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Luke P. Taylor, of Pekin, for appellant.

Stewart Umholtz, State's Attorney, of Pekin (Terry A. Mertel and Richard T. Leonard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE CARTER delivered the judgment of the court, with opinion.

Presiding Justice Wright and Justice Lytton concurred in the judgment and opinion.

**OPINION**

¶ 1    In 1999, respondent, Brad L. Donath, was adjudicated a sexually dangerous person under the Sexually Dangerous Persons Act (Act). 725 ILCS 205/0.01 *et seq.* (West 2008). Respondent filed an application for discharge or conditional release, alleging he had recovered. 725 ILCS 205/9 (West 2008). Following a bench trial, respondent was found to still be sexually dangerous, and his application was denied. Respondent appeals, arguing that: (1) the trial court's denial of his application for conditional release from the sexually dangerous persons program was against the manifest weight of the evidence; (2) he was denied his constitutional right to a speedy trial; and (3) trial counsel was ineffective for failing to protect his speedy trial right. We affirm.

¶ 2                                    FACTS
¶ 3                                 I. Pretrial
¶ 4    In 1999, respondent was charged with criminal sexual assault, aggravated criminal sexual assault, and predatory criminal sexual assault of a child for acts of sexual penetration with minors. 720 ILCS 5/12-13(a)(2), 12-14(a)(2), 12-14.1(a)(1) (West 1998). The charges were later dismissed when respondent was adjudicated a sexually dangerous person under the Act and committed to the Department of Corrections (DOC). 725 ILCS 205/1.01, 8 (West 2008).

¶ 5    On February 9, 2009, respondent filed a *pro se* application for discharge or conditional release from commitment, alleging that he had recovered. 725 ILCS 205/9(a), (e) (West 2008). Respondent, who was committed to the Big Muddy Correctional Center (Big Muddy), alleged that as a result of the counseling and treatment he had received since 1999, he was no longer a sexually dangerous person. On the same date, respondent also filed a motion requesting an independent psychiatric examination and a speedy trial.

¶ 6    Thereafter, the trial court appointed respondent a public defender and ordered the director of the DOC to prepare a statutorily mandated socio-psychiatric report on respondent. See 725

-2-

ILCS 205/9(a) (West 2008). After two agreed continuances by the parties, a hearing on respondent's motions was held on September 14, 2009. On that date, the State told the trial court that the socio-psychiatric report was delayed, because Dr. Mark Carich, the doctor completing the report, had approximately seven reports to complete before starting respondent's report and his assistant had recently quit. Respondent asserted that if the report continued to be delayed, his speedy trial rights would be violated. Respondent then requested a jury trial at the court's earliest convenience. The court set the jury trial for January 18, 2010, with a pretrial date of December 14, 2009, at which time the parties were to submit reciprocal expert reports. The court also granted respondent's request for an independent psychiatric examination.

¶ 7 On November 18, 2009, respondent filed a motion to continue, stating that his appointed expert, Dr. Robert Chapman, wanted assurances that he would be paid for his services and also wished to review the State's report prior to conducting his own evaluation of respondent. Respondent's motion to continue was granted on December 14, 2009, and the case was continued to March 26, 2010.

¶ 8 On March 26, 2010, the State reported that Carich only had one more report to complete before respondent's. The parties then agreed to continue the case until June 18, 2010. On July 28, 2010, respondent filed a motion to reschedule the jury trial, alleging that Carich refused to promptly prepare a socio-psychiatric report. Respondent requested that the cause be set for a jury trial and for the court to order preparation of the report or grant him discharge or conditional release. Respondent's motion was scheduled to be heard on September 17, 2010; however, the parties jointly agreed to continue the hearing to November 22, 2010.

¶ 9 On November 22, 2010, respondent reported receiving the State's socio-psychiatric report dated November 4, 2010. The parties agreed to continue the case to March 18, 2011, so that Chapman could complete his evaluation of respondent. On March 17, 2011, the parties agreed to continue the case until May 20, 2011.

¶ 10 On May 3, 2011, the State filed a motion to reconsider the trial court's September 14, 2009, decision granting the respondent's request for independent examination. The State's motion was granted on May 12, 2011, and the court denied respondent's request for an independent examination. The parties then agreed to continue the case until July 22, 2011. On that date, respondent's request to continue until August 28, 2011, was granted.

¶ 11 On August 18, 2011, respondent filed a motion to reconsider the court's denial of his independent examination. The motion was denied on August 28, 2011, and the case was set for pretrial on November 18, 2011, without agreement from respondent. On November 18, 2011, the court was informed that respondent would be privately hiring Chapman to evaluate him and to testify at trial. The parties then agreed to continue until January 6, 2012. On that date, the parties agreed to continue to January 20, 2012, where respondent waived his right to a jury trial. The parties then agreed to continue until February 3, 2012.

¶ 12                                                    II. Trial

¶ 13 Respondent's bench trial commenced on February 7, 2012. The State's witnesses

consisted of Dr. Angeline Stanislaus, Jessica Stover, and Carich. All three witnesses were part of a team that evaluated respondent and prepared a socio-psychiatric report. In preparing the report, the team conducted a four-hour interview of respondent on October 12, 2010, reviewed his treatment and DOC records, and spoke with other staff members at Big Muddy. Overall, the State's experts opined that respondent remained a sexually dangerous person and should not be discharged or conditionally released. The experts further opined that respondent needed to set his priorities and motivation on recovery, not just release. Respondent also needed to make more progress on the core issues that lead him to engage in sexual offenses before he could be released.

¶ 14    The State first called Stanislaus, a forensic psychiatrist assigned to the sexually dangerous persons unit at Big Muddy. Stanislaus had worked with respondent since 2004 and diagnosed respondent with pedophilia, fetishism, alcohol dependence, and polysubstance abuse. Respondent had suffered from these mental disorders for more than one year. Respondent's pedophilia had affected his emotional and volitional capacity and predisposed him to commit sexual offenses. Stanislaus reported that respondent was taking at least two medications for mood stabilization.

¶ 15    Stanislaus testified that respondent had been participating in the treatment program and had made progress. However, Stanislaus opined that respondent had not resolved several areas that were driving his sexually dangerous behavior. Respondent admitted to sexually assaulting or abusing the 3 victims in the charged offenses and 10 unreported victims. The 13 victims were between the ages of 9 and 13 years old, and the offenses started when respondent was 15 years old and ended when he was arrested at age 21. Stanislaus testified that despite respondent's young age, the pervasiveness and recklessness of his behavior were quite significant.

¶ 16    Stanislaus testified that prior to respondent's commitment, he often used the molestation of children to release his stress. Through his treatment, respondent learned the various factors that played into his offending. Stanislaus, however, was still concerned about respondent's risk to reoffend because he was not consistently applying the intervention techniques he had been taught. Stanislaus reported that respondent struggled with emotional regulation, impulse control, and stress management. Respondent also continued to exhibit signs of sexual preoccupation and a need for immediate gratification. For example, respondent continued to masturbate to his deviant sexual fantasies to cope with stress. Stanislaus opined that respondent still needed to make more progress in these areas before he could successfully deal with resisting the impulse to molest children when released.

¶ 17    The State next called Stover, a social worker with the sexually dangerous persons program. Stover saw respondent at least twice a week during group therapy sessions and had worked with respondent for about 1½ years. Stover reported that respondent had done well in treatment and had made progress, noting that he had acknowledged previously unreported victims and learned the patterns to his offending. However, respondent's progress for the prior year had been at a standstill, and he had not achieved enough progress in the program to be safely released into the community.

¶ 18    Stover testified that respondent had learned several intervention techniques, but

sometimes chose not to utilize them. In one therapy session, respondent became angry and was asked to utilize an intervention technique to de-escalate his anger. Respondent stated he was not ready to intervene and chose to stay angry instead. Stover opined that because respondent would not consistently use intervention techniques in a controlled environment, if released, he would likely turn to sexual means to cope when dealing with stressful situations.

¶ 19 Stover reported that at the time of trial, respondent participated in three staff-facilitated groups and also assisted staff in another group by serving as a role model to its members. As part of assessing respondent's risk of reoffending, Stover administered two risk assessment tools, the Minnesota Sex Offender Screening Tool (MnSOST-R) and the Static-99. Respondent scored a 12 out of 13 on the MnSOST-R, which revealed he was in the high-risk category for sexual recidivism. The Static-99, however, showed that respondent was in the moderate to low risk category for sexual recidivism. Stover opined that the test results underestimated his probability of reoffending, because the score was skewed by both respondent's young age and his lack of criminal convictions due to his admission into the sexually dangerous persons program.

¶ 20 Stover further testified that respondent struggled with prioritizing his recovery, noting that respondent struggled with being self-centered and seeking self-gratification. Over the first six months of 2011, respondent missed 11 group sessions. Respondent then missed another three to four sessions since then. Respondent often chose to get his hair cut, go to the commissary, or go to the gym instead of attend therapy. Other times, respondent complained of being ill. Stover opined that such behavior showed that respondent's motivation was toward release instead of recovery.

¶ 21 The State lastly called Carich, who was a psychologist and coordinator of the sexually dangerous persons program. Carich had worked with respondent since his commitment in 1999. Carich testified that respondent had made substantial progress in the program, noting he had not gotten involved in sexual activities with other individuals at the program and had never quit or gotten suspended. Carich testified that a person in treatment must complete a four-phase program before being released into society, which included: (1) orientation; (2) working and identifying deviant patterns; (3) prerelease or relapse intervention; and (4) preparation for release. Respondent was currently in the third phase. Carich estimated that respondent had approximately two or three years before advancing to phase four.

¶ 22 Carich testified that he reviewed eight factors to evaluate respondent's readiness to be released safely into society. The first factor included motivation and commitment. Carich testified that respondent's participation in the program for 12 years showed motivation; however, he was preoccupied with obtaining release rather than trying to prevent reoffending.

¶ 23 The second factor was taking responsibility for one's behavior. Carich testified that respondent had taken some responsibility by admitting to unknown victims; however, when talking about those victims, respondent minimized and deflected his responsibility. Carich opined that such behavior showed respondent had not yet changed his distorted thinking.

¶ 24 Carich testified that the third factor, social interest, referred to empathy for the victims. Carich testified that respondent showed some empathy for his victims, but his empathy was

not consistent and he did not appreciate the full impact he had on the victims' lives.

¶ 25    The fourth factor, termed social effective, involved interpersonal relationships and mood management. Carich reported that respondent had developed social skills and positive relationships. However, respondent still needed to work on compromising more consistently, dealing with his intimacy issues, and managing his anger more appropriately.

¶ 26    The fifth factor, offense pattern process and intervention, involved becoming aware of risk factors for offending. Although respondent illustrated that he knew how to identify his risk factors, Carich opined that he still needed to demonstrate consistent use of intervention techniques to reduce his sexual deviancy and manage his mood. Respondent most often used avoidance as an intervention technique. Carich opined that such a technique was less effective in the community; therefore, respondent needed to work on the other numerous techniques he had learned.

¶ 27    The sixth factor is lifestyle, which involved addressing antisocial behaviors. Carich testified that when respondent was offending, his antisocial behaviors led him to seek self-gratification at the expense of others. Respondent had made some positive changes to his behavior, but he still needed to work on his narcissism.

¶ 28    The seventh factor was core issues related to offending and resolution. Respondent identified experiences in his life related to his offending, including issues with abandonment, viewing women of all ages as sexual objects, and the need to control others. Carich noted that respondent became sexually attracted to one of the female therapists and also corresponded with an old girlfriend. Carich opined that such behavior showed that respondent still needed to deal with and manage his core issues before he could be released.

¶ 29    Lastly, the eighth factor related to managing sexual arousal and deviant fantasies. Carich testified that respondent had made some improvement, but still needed to keep working on this area. Respondent was still masturbating to relieve stress, which only reinforced respondent's use of sex as a coping method. Carich was concerned that if respondent were released, he would relieve his stress by reoffending. Carich concluded that respondent was at a high risk to reoffend if released into the community.

¶ 30    After the State rested, respondent called Chapman, a psychiatrist who evaluated respondent and prepared a report dated December 1, 2011. Chapman had previously evaluated respondent for release in 2004, and at that time, opined that respondent had sufficiently recovered to be a suitable candidate for conditional release. Chapman's conclusion after the instant evaluation was again that respondent had a low risk to reoffend and would be more likely than not to succeed if conditionally released. Chapman opined that respondent was motivated for recovery, but Chapman noted that he did not see a distinction between motivation for release and motivation for recovery. Chapman also reported that respondent had poor impulse control, had trouble following proper procedures, had a tendency toward addictive behavior, and suffered from mood swings. Despite these behaviors, Chapman still recommended release. Chapman testified that these behaviors were merely symptoms of respondent's obsessive-compulsive personality and attention deficit disorder, and they had little correlation to his risk to reoffend.

¶ 31    Respondent then testified on his own behalf, stating that he was 33 years old and had

been in the sexually dangerous persons program for 12 years. Respondent reported assisting staff with group therapy sessions for approximately four years. Respondent testified that of the four-phase program, he was in phase three. Respondent had been in phase three since 2003 or 2004. When questioned about the 11 absences he had from group therapy in 2011, respondent stated that 5 were because he was in the commissary and 6 were related to illnesses.

¶ 32       Respondent reported that he was taking medication to regulate his mood and noted that they worked well. Respondent testified that if released, he would continue to take his medication as prescribed. Additionally, respondent would use the intervention techniques he had acquired during his treatment to stop any temptation to reoffend. Specifically, respondent testified he would notify his therapist, probation officer, or any other peace officer if needed. Respondent also testified that he no longer viewed children as sexual beings, and he would be able keep his sexual arousal under control if released.

¶ 33       The trial concluded on February 8, 2012, and the court took the matter under advisement. On February 23, 2012, the trial court held that respondent remained a sexually dangerous person and denied his application for discharge or conditional release. Respondent was committed to the DOC. No posttrial motions were filed. Respondent appeals.

¶ 34                                    ANALYSIS
¶ 35                          I. Sexually Dangerous Person
¶ 36       On appeal, respondent first argues that the trial court's denial of his application for conditional release from the sexually dangerous persons program was against the manifest weight of the evidence.

¶ 37       Under section 9(a) of the Act, a respondent who has been found to be a sexually dangerous person may submit an application to the trial court setting forth facts showing that he has recovered. 725 ILCS 205/9(a) (West 2008). The court must then hold a hearing, and the State has the burden of proving by clear and convincing evidence that respondent remains a sexually dangerous person. 725 ILCS 205/9(b) (West 2008). A person is sexually dangerous if: (1) the person suffered from a mental disorder for at least one year prior to filing the petition; (2) the mental disorder is associated with criminal propensities to the commission of sexual offenses; (3) the person demonstrated that propensity toward acts of sexual assault or acts of sexual molestation of children; and (4) there is an explicit finding that it is substantially probable that the person would engage in the commission of sex offenses in the future if not confined. 725 ILCS 205/1.01 (West 2008); *People v. Masterson*, 207 Ill. 2d 305 (2003).

¶ 38       If the court finds that respondent "appears no longer to be dangerous but that it is impossible to determine with certainty under conditions of institutional care that such person has fully recovered," the court may conditionally discharge respondent. 725 ILCS 205/9(e) (West 2008). The court's finding that respondent is still sexually dangerous may not be disturbed on review, unless that decision is against the manifest weight of the evidence. See *In re Commitment of Sandry*, 367 Ill. App. 3d 949 (2006). A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Id.*

¶ 39 Respondent asserts that the trial court should have granted his conditional release, noting that the State's experts testified that respondent was doing relatively well in treatment, and, on one risk assessment tool, was at moderate to low risk of reoffending. Upon review of the record, however, we find that the trial court's decision to deny respondent's conditional release was not against the manifest weight of the evidence. All three of the State's experts concluded that respondent continued to be a sexually dangerous person, and it was more likely than not that he would reoffend in the future if not confined. Respondent suffered from pedophilia since a young age and struggled with, among other things, emotional regulation, impulse control, and stress management. Based on respondent's progress in treatment and his predisposition to sexual deviance, the State's experts concluded that respondent still had to deal with his core issues and consistently use intervention techniques before he would be suitable for conditional release.

¶ 40 Respondent points to Chapman's opinion that he had sufficiently recovered and was a good candidate for conditional release. However, even Chapman reported that respondent had poor impulse control, had trouble following proper procedures, had a tendency toward addictive behavior, and suffered from mood swings. According to Chapman, such behaviors were unrelated to respondent's risk to reoffend and were symptoms of his mental disorders, which would be with him for the rest of his life. However, the State's experts opined that respondent's behaviors relating, in part, to impulse control and anger management directly concerned respondent's control over his sexual deviancy and ability to utilize intervention techniques to prevent reoffending.

¶ 41 In sum, the State presented unequivocal testimony that despite respondent's 12 years in treatment, respondent had not successfully addressed his sexual preoccupation or the core issues that predisposed him to offend. It was for the trial court to determine the weight to be given to Chapman's testimony and the other evidence, and we find nothing in the record that would require us to substitute our judgment for that of the trial court. See *People v. Deleon*, 227 Ill. 2d 322 (2008). Therefore, based on the evidence presented, we hold that the trial court's decision to deny respondent's application for conditional release was not against the manifest weight of the evidence.

¶ 42                                    II. Speedy Trial Right

¶ 43 Respondent next argues that he was denied his constitutional right to a speedy trial and should be released from custody.

¶ 44 While proceedings under the Act are civil in nature, those subject to its proceedings must be accorded the same essential protections, such as the due process right to a speedy trial. 725 ILCS 205/3.01 (West 2008); *People v. Trainor*, 196 Ill. 2d 318 (2001). The United States Supreme Court has identified four factors that must be balanced in determining whether a respondent's right to a speedy trial has been violated. See *Barker v. Wingo*, 407 U.S. 514 (1972). The four factors are: the length of delay in bringing respondent to trial, the reasons for the delay, the prejudice, if any, to respondent, and respondent's assertion of his right. See *People v. Crane*, 195 Ill. 2d 42 (2001) (citing *Barker*, 407 U.S. 514).

¶ 45 Delays approaching one year are generally presumed to be prejudicial, such that they will

trigger consideration of the four factors; however, this presumption does not imply that respondent was prejudiced by the delay. *Id.* No single factor is necessary or sufficient to find that a speedy trial violation occurred. *Id.* The ultimate determination of whether respondent's constitutional speedy trial right has been violated is reviewed *de novo*. *Id.*

¶ 46                     A. Length of Delay and Assertion of Right

¶ 47    In applying the factors to the instant case, the State does not dispute that the nearly three-year delay from respondent's filing of his application until the trial was presumptively prejudicial. The State also does not dispute that respondent asserted his right to a speedy trial. The parties do dispute, however, who was responsible for the delay and whether respondent was prejudiced by such delay.

¶ 48                             B. Reasons for Delay

¶ 49    Regarding the reason for the delay, the State bears the burden to justify the delay. *Crane*, 195 Ill. 2d 42. However, reasons for the delay are weighed differently, such that an intentional delay will weigh heavier against the State than a more neutral reason. *Id.* Moreover, the mere fact that the delay is attributable to the State does not always mean that a speedy trial violation has occurred. *Id.*

¶ 50    The main thrust of respondent's argument is based on the period between the filing of respondent's application on February 9, 2009, and when respondent acknowledged in open court his receipt of the socio-psychiatric report on November 22, 2010. Respondent argues that this 21-month delay should be attributable to the State because the trial was unable to proceed until the State submitted its socio-psychiatric report. See 725 ILCS 205/9(a), (b) (West 2008) (stating that once an application for discharge under the Act is filed, the director is required to obtain a socio-psychiatric report concerning respondent, and the trial court is required to consider this report at the discharge hearing). The State's reasoning for this delay was based on the seven reports Carich had to complete before respondent's and the departure of his assistant. Such delay was not intentional and thus will not be weighed as heavily against the State as an intentional delay. See *Crane*, 195 Ill. 2d 42. Furthermore, during this period alone, respondent shared responsibility for some delay by agreeing to several continuances and filing at least three motions that were heard by the court.

¶ 51    Respondent argues that his counsel agreed to and requested continuances against his wishes, and therefore they should not be attributable to him. A delay is occasioned by respondent when respondent's acts caused or contributed to the delay. *People v. Kaczmarek*, 207 Ill. 2d 288 (2003). When respondent's counsel requests a continuance on behalf of respondent, any delay caused by that continuance will be attributed to respondent, as a client is generally bound by the acts or admissions of his attorney. *Id.* Here, respondent was present for the majority of the court appearances, and despite asserting his speedy trial right, he allowed his counsel to agree to and request continuances in his presence. See *id.* (stating that a respondent will not be bound by his attorney's actions when he clearly and convincingly attempted to assert his right to discharge his attorney and proceed to an immediate trial).

¶ 52    Although the delay in submitting the report is not attributable to respondent *per se*, we

-9-

cannot say that respondent's continuances during this period are meaningless or that his inaction would absolve him of occasioning the delay related to his continuances. Even if we determined that the entire period of delay related to the State's report was attributed to the State, the record shows that after the report was submitted, respondent requested or agreed to a majority of the continuances. From our review of the record, we find that the reasons for the lengthy delay do not clearly weigh in favor of finding a speedy trial violation.

¶ 53                                C. Prejudice

¶ 54        As for prejudice to respondent, other than the time he spent in custody, he has revealed no evidence that the proceedings were impaired by the delay. No prejudice exists just by being in custody during pendency of his application. See *In re Detention of Hughes*, 346 Ill. App. 3d 637 (2004). Furthermore, respondent's assertion that his condition may have deteriorated during the pendency of his application is not supported by the record. The majority of the State's testimony at trial revealed that respondent had been making progress in treatment, but still had more progress to make before being suitable for release. As such, the prejudice factor weighs in favor of the State.

¶ 55                               D. Conclusion

¶ 56        After balancing all four factors in the instant case, we hold that no speedy trial violation occurred. While we are disturbed by the three-year delay in bringing respondent to trial, we believe that the lack of prejudice respondent suffered, coupled with his request for and acquiescence in a large majority of the continuances throughout the proceedings, precludes a finding that respondent was deprived of his constitutional right to a speedy trial.

¶ 57                     III. Ineffective Assistance of Counsel

¶ 58        Finally, respondent argues that his trial counsel was ineffective for failing to protect his constitutional right to a speedy trial by acquiescing in continuances and not moving for discharge or conditional release.

¶ 59        To prevail on a claim for ineffective assistance of counsel, a respondent must show that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's deficient performance prejudiced respondent such that he was deprived of a fair trial. *Strickland v. Washington*, 466 U.S. 668 (1984); *People v. Lawton*, 212 Ill. 2d 285 (2004). Respondent's failure to satisfy either prong defeats a claim of ineffective assistance. *People v. Graham*, 206 Ill. 2d 465 (2003). Furthermore, the failure of counsel to argue a speedy trial violation cannot satisfy the *Strickland* test if there was no lawful basis for raising a speedy trial violation. See *People v. Phipps*, 238 Ill. 2d 54 (2010); *Hughes*, 346 Ill. App. 3d 637.

¶ 60        As previously discussed, we held that respondent was not denied his constitutional right to a speedy trial. Thus, respondent was not prejudiced by his counsel's failure to object to continuances and move for respondent's release from custody based on a speedy trial violation. See *Hughes*, 346 Ill. App. 3d 637. Accordingly, respondent cannot establish a

claim for ineffective assistance of trial counsel.

¶ 61                                CONCLUSION

¶ 62        For the foregoing reasons, the judgment of the circuit court of Tazewell County is
affirmed.

¶ 63        Affirmed.