NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190229-U

NO. 4-19-0229

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 22, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Petitioner-Appellee, | ) | Circuit Court of |
| v. | ) | Moultrie County |
| CLIFFORD L. ENSLEY, | ) | No. 02CF66 |
| Respondent-Appellant. | ) | |
| | ) | Honorable |
| | ) | Wm. Hugh Finson, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Steigmann and Justice Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, finding the trial court did not err in finding that
respondent remained a sexually dangerous person.

¶ 2    In January 2003, respondent, Clifford Ensley, admitted to being a sexually
dangerous person under the Sexually Dangerous Persons Act (SDP Act) (725 ILCS 205/0.01 to
12 (West 2000)), and the trial court committed him to the custody of the Director of the Illinois
Department of Corrections (DOC) until such time as he was no longer a sexually dangerous
person. In July 2012, respondent filed an application showing recovery and for conditional
discharge. Following a bench trial in February 2019, the trial court entered a written order
denying respondent's application.

¶ 3　　　　　On appeal, respondent argues the trial court erred in denying his application for conditional release because (1) the State's expert improperly relied on an actuarial measure that is not intended for use on individuals, such as respondent, who have been committed for a lengthy period of time and (2) he presented compelling evidence he was not substantially probable to reoffend. We disagree and affirm the trial court's judgment.

¶ 4　　　　　　　　　　　　　I. BACKGROUND

¶ 5　　　　　On September 24, 2002, the State charged respondent, Clifford L. Ensley, by information with two counts of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2000)) and one count of aggravated criminal sexual abuse (720 ILCS 5/12-16(c)(1)(i) (West 2000)). On October 22, 2002, the State charged respondent by information with 20 counts of child pornography (720 ILCS 5/11-20.1(a)(1)(iii) (West 2000)).

¶ 6　　　　　On October 23, 2002, the State filed a petition to proceed under the SDP Act. In January 2003, respondent admitted the State's petition, and the trial court ordered respondent be committed to the custody of DOC.

¶ 7　　　　　In July 2012, respondent filed an application for recovery requesting that the court enter an order of discharge or, in the alternative, he be conditionally released. Between 2012 and 2017, the court appointed and later vacated the appointments of several experts to perform a psychological evaluation of respondent. Additionally, several attorneys entered appearances and withdrew their representation of respondent. In November 2017, the court ultimately appointed Dr. Kristopher Clounch of Wexford Health Services, Inc. (Wexford), to evaluate respondent. In March 2018, Dr. Lesley Kane was appointed to perform an independent psychological evaluation.

¶ 8　　　　　　　　　　　　A. Respondent's Trial

¶ 9        Respondent's bench trial began on February 28, 2019.

¶ 10                        1. *The State's Case-in-Chief*

¶ 11                        a. Dr. Kristopher Clounch

¶ 12        Dr. Kristopher Clounch was admitted as an expert witness. Dr. Clounch testified he had worked for Wexford since 2012 and had performed between 130 and 135 sex offender evaluations. Dr. Clounch said individuals who have been found by a court to be sexually dangerous are sent to Big Muddy Correctional Center (Big Muddy) for treatment. Dr. Clounch met with respondent three times since he filed his application for recovery in 2012: for three and a half hours in 2012, three hours in 2016, and two hours and twenty minutes in 2017. During these meetings, Clounch performed a clinical interview, where he asked respondent "about his history, as well as his sexual offenses, and *** issues associated with his current treatment." Following the meetings, Dr. Clounch prepared three reports, which were later admitted into evidence as People's Exhibit Nos. 1, 2, and 3. He relied on treatment records, prior evaluations, and group notes and semiannual evaluations from the sexually dangerous persons (SDP) program at DOC.

¶ 13        Dr. Clounch testified based on his education, training, experience, and evaluation of respondent, he believed respondent remained a sexually dangerous person because "he has a mental condition that has resulted in him having difficulty controlling his behavior," and "he continues at this time to have not made sufficient progress to reduce his risk to re-offend in the future." Dr. Clounch diagnosed respondent with "pedophilic disorder, sexually attracted to females, nonexclusive type." The "non-exclusive type" referred to "the fact that [respondent] also engages in sexual behaviors and/or fantasies about adults as well as children." This diagnosis qualified as a mental disorder for purposes of the SDP Act. Dr. Clounch opined

- 3 -

respondent was "substantially probable to re-offend against children if not confined." As part of his evaluation to assess respondent's risk of reoffending, Dr. Clounch administered two actuarial measures: the STATIC-99R and the STABLE-2007.

¶ 14          Dr. Clounch testified the STATIC-99R is a risk assessment measure professionals use to determine the likelihood that a person committed under the SDP Act will reoffend. The term "static" refers to the assessment's reliance on "historical or ultimately unchanging factors." Dr. Clounch scored respondent as a "minus 1," under this assessment, which placed respondent in a "below average risk category." Dr. Clounch believed respondent's score was an "underrepresentation of his risk due to the other factors that currently present and his lack of progress in treatment."

¶ 15          Dr. Clounch said the STABLE-2007 is another assessment that "is currently being used to assess for dynamic risk factors." Dynamic factors are "psychologically meaningful" and "thought of as being a trait, like a characteristic trait of the individual." The STABLE-2007 is used "to determine if there is an increased risk [of recidivism] beyond what would be seen by the actuarial." Dr. Clounch scored respondent an 18 out of 26 on the STABLE-2007 assessment, meaning he was at "high risk for re-offending."

¶ 16          The State then introduced a document marked as People's Exhibit No. 6. The document consisted of a matrix in which Dr. Clounch testified he plotted respondent's STATIC-99R and STABLE-2007 scores. Based on this matrix, Dr. Clounch testified respondent fell under "[L]evel I[V]a." He explained Level IVa "is the second highest of the levels that are provided by the STATIC-99R" and "[i]t indicates that the individuals who are currently in that level have been found to re-offend at a rate of two times the rate of the average sex offender."

¶ 17        Dr. Clounch testified based on his review of the SDP program evaluations, "[o]verall it appears as though [respondent] has made very little progress during his time in treatment." For example, in 2016, respondent participated in the Rational Emotive Behavioral Therapy (REBT) group but was later removed from it "due to the fact that he was having significant difficulty understanding the material, and when provided feedback, he was not open to feedback and unwilling to attempt to adapt his understanding of the material."

¶ 18        On cross-examination, Dr. Clounch admitted respondent had not had any incidents of "sexual acting out" during his commitment and had not been caught with pornography. Respondent generally followed the rules at Big Muddy and never received any "tickets" for institutional rule violations. Dr. Clounch agreed this lack of rule violations indicated respondent is able to function in "a very highly structured environment."

¶ 19                    b. Heather Young

¶ 20        Heather Young testified she was a licensed clinical professional counselor and was employed as a sex offender therapist at Big Muddy, where she had worked since August of 2015. In her current role, Young had supervisory duties in coordinating SDP programs and treatment. Young explained how there are 23 different SDP treatment groups, each of which has a facilitator who keeps notes on its individual members. Group facilitators sometimes assign homework or other assignments to the participants in addition to organizing the group and maintaining the discussion. Participants in the SDP program are expected to attend groups, participate, give feedback to other group members, remain open to the feedback they are given, ask questions, and complete homework assignments.

¶ 21        Young testified the SDP program currently has four phases: phase one, which is "basic knowledge of the treatment terms, basic understanding of their life, history of

victimology, *** understanding of their cycle"; phase two, "where [participants] are showing a more advanced understanding of concepts and are attempting to display utilizing them in their lives, *** [and] identify their own patterns of behaviors to identify their own sexual deviancy *** [and] offense patterns"; phase three, "continuation of that knowledge, *** more of an intermediate or advanced understanding of how their patterns of behavior, their belief systems [a]ffected their offending, *** showing the ability to change those and understanding that those were harmful and unhealthy"; and phase four, "having all of those things put together, having an understanding of their cycle, showing a readiness to continue to make those changes in the community."

¶ 22     Young knew respondent and said he was currently in phase two of the SDP program. According to Young,

> "[Respondent] shows an understanding of a lot of the treatment concepts and interventions. He can explain a lot of the—kind of intellectual or superficial processes we go through. He is phase two because he's not showing an understanding or displaying that for his own cycle, patterns of offense, identifying his only personal belief systems and changes he's made to those belief systems, identifying arousal control offense patterns that fit his offending."

Young explained despite the fact respondent entered the program in 2003, he was only in phase two because "[t]he struggle becomes whenever [participants are] applying [the treatment processes] to their own offense patterns, when they are identifying their own personal belief systems, when they are utilizing that to change their own internal processes and really getting an understanding why those chose to offend ***."

¶ 23        The State then introduced People's Exhibit No. 12 into evidence, which was a

document entitled "Semi-Annual Program Evaluation Form." Young testified the form "is

designed to look[ ] at those specific factors and content for us to determine how [participants] are

doing in their treatment." Under the form category "compliance with treatment," Young testified

there are four different scores which are determined by the individual participant's primary

therapist. According to Young, a score of "[z]ero indicates minimal need for treatment. One is

some need. Two is considerable need, and then a three is very considerable need for treatment."

Young said she was currently respondent's primary therapist and saw him at least once per week.

¶ 24        The State then introduced People's Exhibit Nos. 8, 9, 10, and 11, which consisted

of respondent's semiannual evaluations from the time period of January 2017 to December 2018.

Exhibit No. 8 covered the period from January 2017 to July 2017. Regarding the first component

of the "compliance with treatment" category; measuring attendance and participation, Young

testified respondent attended and participated in his groups, gave feedback, and presented his

homework assignments. However, "there were times in groups where he would not appear open

to feedback" and "he would either become argumentative or not agree with the feedback."

Regarding the second component, "offense disclosure," Young said respondent "takes

responsibility for one of his offenses" but "does not take any responsibility for two of his other

offenses that are in his history."

¶ 25        Under the eighth category of the evaluation, "cognitive restructuring skills,"

Young scored respondent a three in all components because he "struggles with identifying

rational beliefs" and, in "multiple groups he has argued about the difference between rational and

irrational." Young testified that at some point, she had to withdraw respondent from the REBT

group because "after multiple redirection[s] in that group, he would come back and bring the

exact same answers, the exact same examples without *** changing any of them, without challenging any of them, and he was saying that he doesn't have any irrational thinking, that there are no issues ***." Respondent "wasn't making any progress," "wasn't listening," and "wasn't taking the feedback that he was given." While Young agreed she did not use her evaluations to express any opinion as to whether respondent should be released into the community, Young stated it would be "very important" for him to attend treatment if he were released.

¶ 26　　　　On cross-examination, Young testified respondent discussed "extreme pornography usage" in group treatment but acknowledged he had never been caught with pornography during his time at Big Muddy. When asked whether that was "an important step for him to take to get better, that he change[d] his behavior as opposed to describing *** how he changed his belief," Young said she would like for him to identify how he has made changes internally when he claims he is no longer attracted to children. Specifically, Young testified she had "trouble believing" respondent had changed when he remains "unable to identify the steps in the process to change ***." Young testified she believed respondent has "the ability to communicate" and she did not consider his argumentative behavior in group as "looking for clarification" because he continued to "repeat[] the exact same thing over and over."

¶ 27　　　　In the time Young had worked at Big Muddy, she had not witnessed any "anger or outbursts" from respondent. In Young's opinion, respondent had to repeat courses he had already completed—such as anger management—because he was "not gaining the understanding from the group." When asked whether there was a "fatigue factor of doing the same [group] over and over again," Young replied that although respondent "completed group successfully, meaning he

attended the group the entire time and completed," he "still struggled throughout that group with the concepts" and blamed others for his anger.

¶ 28        Young admitted to some typographical errors in her treatment notes and said it was "possible" there were factual inaccuracies in the notes. She agreed that because her notes were used in preparing annual evaluations—such as the one prepared by Dr. Clounch—it was "absolutely vital to be accurate *** about what happened in the groups." Young acknowledged one of her progress notes, which was admitted as Respondent's Exhibit No. 2, contained an inaccurate statement about respondent having a male victim. Young also acknowledged several of her other progress notes, which were admitted as Respondent's Exhibit Nos. 3, 4, and 5, contained the wrong DOC inmate number for respondent. Young reiterated she "specifically talk[s] about treatment" and confirmed she does not have any opinion of how respondent would fare if released to the community.

¶ 29                      3. *Respondent's Case-in-Chief*

¶ 30                         a. Dr. Lesley Kane

¶ 31        Dr. Lesley Kane was admitted as an expert witness. Dr. Kane testified she performed a "Sexually Violent Person's Evaluation" for respondent. As part of the evaluation process, Dr. Kane testified she reviewed records from DOC, including medical treatment records, psychiatric records, police reports, and any other evaluations performed by previous psychologists. She also did a "scored and an actuarial measure" using the STATIC-99R. Dr. Kane testified the STATIC-99R used 10 "unchanging variables that correlate with sexual recidivism." According to Dr. Kane, "the higher the score, the higher the risk." The potential scores ranged from negative three to six-plus. From her evaluation, respondent scored a negative one, which placed him in a "below average" risk category. With a score of negative one,

respondent fell in the 9.7 percentile, meaning that approximately 90% of typical sex offenders scored higher than him. In Dr. Kane's opinion, if respondent were conditionally released, he was not substantially probable to commit future sexual offenses; however, "[i]f he were just discharged, *** there [would be] a greater risk of that occurring."

¶ 32　　　　Dr. Kane testified she reviewed Dr. Clounch's evaluation of respondent and noticed he used an additional actuarial measure (the STABLE-2007) she did not use. Dr. Kane testified she did not use the STABLE-2007 because "when [she] took the training for that measure, the individual who ran the training had advised not to use it with individuals who have been incarcerated for a lengthy period of time." The STABLE-2007 uses "dynamic variables," which are things that can change from "week to week, month to month, year to year." Certain variables on the STABLE-2007 could have been true at the time an individual was committed to the SDP program but not 20 years later. Accordingly, for someone such as respondent who has been incarcerated for 16 years, Dr. Kane believed that "there's certain factors [in the STABLE-2007] that cannot be accurately assessed." Dr. Kane disagreed with Dr. Clounch's reliance on the STABLE-2007 and his conclusion respondent had a higher risk of reoffending based upon that actuarial measure.

¶ 33　　　　Dr. Kane testified respondent's "pedophilic issues" have fluctuated over time and he acknowledges them sometimes more than others. However, Dr. Kane opined "denial is *** not deemed as [a] risk factor *per se*" and respondent's denial did not make it "substantial[ly] probable" he would reoffend. Dr. Kane believed certain resources available in the community, such as polygraph testing and more individualized treatment, would be helpful in "break[ing] down" respondent's denial issues. Dr. Kane also testified GPS monitoring could provide some "high-level monitoring" as an initial condition of respondent's release back into the community.

It was important to Dr. Kane respondent had received no behavioral tickets during his time at Big Muddy because it showed he was capable of complying with rules. Dr. Kane testified she had no reason to believe respondent cannot comply with rules outside of the facility just as he had complied while at Big Muddy.

¶ 34 Dr. Kane testified although respondent had a qualifying disorder under the SDP Act, she did not think respondent needed institutional care; rather, respondent "needs strict supervision and treatment." Dr. Kane characterized the conditions imposed on a sexually dangerous person upon discharge as a "very high level" of supervision. Although Dr. Kane believed respondent was still a sexually dangerous person, she also believed he could be "safely and effectually managed and treated on conditional release."

¶ 35                                   3. *Trial Court's Decision*

¶ 36 Respondent's trial was continued to March 19, 2019. Prior to argument, the State and respondent stipulated to the admission of a STABLE-2007 coding manual, which was marked as People's Exhibit No. 13, to rebut Dr. Kane's testimony that the STABLE-2007 actuarial measure should not be used for offenders who have been incarcerated for a long period of time. Under the heading "Sexual Offenders Serving Long Prison Sentences," the STABLE-2007 coding manual states the following:

> "Research has yet to examine the extent to which STABLE-2007 provides accurate assessments of criminogenic needs among offenders still in prison while serving long sentences. In this context, 'long' would signify sufficient time that is reasonable to expect that previous community behaviour would no longer be a valid indicator of future community behavior.

Assessing the stable variables for incarcerated offenders requires looking for different indicators than when these variables are assessed in the community. *** In general, research has shown that it is possible to reliably assess variables similar to those targeted in STABLE-2007 for offenders serving long periods of incarceration, and assessment tools involving similar constructs have demonstrated validity in predicting sexual recidivism based on information collected in prison ***. Furthermore, the overall STATIC/STABLE-2007 risk assessment is largely based on the STATIC-99R or STATIC-2002R scores, which have been validated in dozens of studies of incarcerated offenders.

Consequently, we recommend that STABLE-2007 be used for offenders serving long sentences, given the necessary cautions about the difficulty of evaluating change in controlled environments. Evaluators need to remember that the STABLE-2007 items are primarily scored based on expected behavior given that the individual has opportunity to offend, which may or may not be consistent with the individual's current or recent behavior in prison or hospital ***."

¶ 37   At the conclusion of the trial, the court stated the following:

"I have observed both doctors and Ms. Young while they testified and noted their demeanor. The Court finds that the testimony of Dr. Clounch was credible, well-thought-out and persuasive. He testified that he diagnosed [respondent] with pedophilic disorder. He's had that disorder for at least four years, cannot control his actions, [respondent] can't. Dr. Clounch said that [respondent] has made little progress in treatment. He's dropped out of the—one of the group therapies last year. He understands—respondent understands the various concepts that have

been presented to him in treatment at Big Muddy but he cannot or will not apply those concepts to himself.

Ms. Young testified *** that [respondent] *** understands the concepts but cannot or does not apply them to himself. [Respondent] has attended group counseling sessions but is not receptive to feedback from the other participants or becomes argumentative. He doesn't accept responsibility for his actions. He blames others. At one point [respondent] was removed from one of the groups because he was making no progress. [Respondent], according to Ms. Young, does not show any appreciation of the effect of his actions on other people. She said he's made minimal progress in group. *** When he came back to that group, he wasn't really prepared to participate; he was just there. She testified that respondent hasn't changed his sexual beliefs or attitudes. He has little understanding of his offense cycle. The court also finds Ms. Young to be credible and persuasive.

Bottom line is [respondent] has not progressed. He's pretty much the same person today as he was in 2003. So for all those reasons, the court finds that the State has proven by clear and convincing evidence that there is still a substantial probability that [respondent] will commit further sex crimes as to children if he's released, even if he's released conditionally."

¶ 38     On March 21, 2019, the trial court entered a written order denying respondent's application for discharge or conditional release, finding that (1) respondent is a sexually dangerous person as defined by section 1.01 of the SDP Act (725 ILCS 205/1.01 (West 2018)),

- 13 -

and (2) there exists a substantial probability that if released from DOC, respondent is likely to commit acts of sexual assault or acts of sexual molestation of children.

¶ 39 This appeal followed.

¶ 40 II. ANALYSIS

¶ 41 On appeal, respondent argues the trial court's denial of his application for conditional release from the SDP program was against the manifest weight of the evidence.

¶ 42 Under section 1.01 of the SDP Act (725 ILCS 205/1.01 (West 2018)), a person is sexually dangerous if he has (1) a mental disorder existing for at least one year before the petition was filed, (2) criminal propensities to the commission of sex offenses, and (3) demonstrated propensities toward acts of sexual assault or sexual molestation of children. See *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 103, 48 N.E.3d 185. " '[C]riminal propensities to the commission of sex offenses' means that it is substantially probable that the person subject to the commitment proceedings will engage in the commission of sex offenses in the future if not confined." 725 ILCS 205/4.05 (West 2018). The parties in this case dispute only the issue of whether it is substantially probable that respondent will reoffend.

¶ 43 Under section 9(a) of the SDP Act, a person who has been found to be sexually dangerous may submit an application to the trial court setting forth facts showing he has recovered. 725 ILCS 205/9(a) (West 2018). The court must then hold a hearing wherein the State has the burden to prove by clear and convincing evidence that the individual remains sexually dangerous. See *People v. Bailey*, 2015 IL App (3d) 140497, ¶ 12, 40 N.E.3d 839.

¶ 44 The court may conditionally discharge an individual from the SDP program if it finds that he "appears no longer to be dangerous but that it is impossible to determine with certainty under conditions of institutional care that such person has fully recovered." 725 ILCS

205/9(e) (West 2018). "The [trial] court's finding that [a] respondent is still sexually dangerous may not be disturbed on review, unless that decision is against the manifest weight of the evidence." *People v. Donath*, 2013 IL App (3d) 120251, ¶ 38, 986 N.E.2d 1222. A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Id.* We also note the trier of fact is in the best position to weigh the evidence and assess the credibility of the testimony and evidence presented. *People v. Houde*, 2019 IL App (3d) 180309, ¶ 26.

¶ 45        Respondent first argues the trial court erred in finding the State presented clear and convincing evidence respondent was substantially probable to reoffend because Dr. Clounch improperly relied on the STABLE-2007 actuarial measure. According to respondent, had Dr. Clounch not used this measure or used it with caution as intended, he would have had no basis on which to conclude respondent was substantially likely to reoffend. We disagree. First, respondent misstates information from the STABLE-2007 coding manual. Respondent contends the coding manual states the STABLE-2007 should be used "with caution" for persons who have been incarcerated for a long period of time. We do not find this language anywhere under the heading "Sexual Offenders Serving Long Prison Sentences." In fact, the coding manual affirmatively recommends the measure be used for offenders serving long prison sentences "given the necessary cautions about the difficulty of evaluating change in controlled environments." The coding manual specifically provides instructions for the use of this actuarial measure for persons serving long prison sentences. Additionally, the coding manual only recommends using the STABLE-2007 "with caution" for "sexual offenders who have a significant development delay of the cognitive type, or who have a history of major mental illness (*e.g.*, schizophrenia, mania)." Respondent does not allege he suffers from any

- 15 -

development delay or major mental illness. Accordingly, we find Dr. Clounch did not improperly use the STABLE-2007 in evaluating respondent's risk of reoffending.

¶ 46　　　　Moreover, even if we assumed *arguendo* that Dr. Clounch improperly relied on the STABLE-2007, the trial court's denial of respondent's application for release or conditional discharge was not contrary to the manifest weight of the evidence. The record shows Dr. Clounch did not rely exclusively on the STABLE-2007 in preparing his report and in drawing the conclusion respondent was substantially probable to reoffend. Dr. Clounch relied extensively on respondent's treatment records from Big Muddy showing he made very little progress in the program. In fact, the trial court stated the "[b]ottom line" was respondent had not progressed and that he was "pretty much the same person today as he was in 2003." Even though respondent had not received any behavioral tickets at Big Muddy and scored in the "below average" risk category using the STATIC-99R alone, Dr. Clounch believed this score was an "underrepresentation of [respondent's] risk due to the other factors that currently present and his lack of progress in treatment."

¶ 47　　　　The trial court also found Young's testimony persuasive. Young testified respondent struggled to apply the concepts from treatment to his life, he was not open to feedback from others, he still blamed other people in his life for his issues, and he failed to take responsibility for two of his offenses. Respondent had consequently been removed from the REBT group due to his lack of progress and unwillingness to meaningfully participate. The trial court was in the best position to determine the credibility of the witnesses and we will not disturb those findings in the absence of evidence to the contrary. Accordingly, the trial court did not err in denying respondent's application for release or conditional discharge.

¶ 48　　　　　　　　　　　　III. CONCLUSION

¶ 49        For the reasons stated, we affirm the trial court's judgment.

¶ 50        Affirmed.