NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 190842-U

NO. 4-19-0842

FILED
September 29, 2020
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Woodford County |
| DANIEL SIZEMORE, | ) | No. 84CF48 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Paul G. Lawrence, |
| | ) | Judge Presiding. |

_____

JUSTICE KNECHT delivered the judgment of the court.
Justices DeArmond and Holder White concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The jury's finding defendant remained a sexually dangerous person was not against the manifest weight of the evidence.

¶ 2     In 1985, defendant, Daniel Sizemore, was deemed a sexually dangerous person leading to involuntary civil commitment under the Sexually Dangerous Persons Act (Act) (Ill. Rev. Stat. 1983, ch. 38, ¶ 105-1.01 *et seq.* (recodified at 725 ILCS 205/0.01 *et seq.* (West 2016))). In December 2018, defendant filed an application for discharge or conditional release under the Act (725 ILCS 205/9 (West 2016)). In November 2019, a jury found defendant remained a sexually dangerous person.

¶ 3     On appeal, defendant argues the denial of his application for discharge or conditional release was against the manifest weight of the evidence. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5        In December 2018, defendant filed an application for discharge or conditional

release pursuant to the Act (725 ILCS 205/9, 10 (West 2016)). Defendant had previously filed

applications for discharge in 1985, 1987, 1989, 1990, 1992, 1997, 2002, 2003, and 2011.

Defendant elected to have the hearing on his motion before a jury. See 725 ILCS 205/9(b) (West

2016) ("The sexually dangerous person or the State may elect to have the hearing before a

jury."). On November 22, 2019, the hearing was held before a jury. A "socio-psychiatric report

concerning the applicant" was prepared after the petition was filed. 725 ILCS 205/9(a) (West

2016). The evaluation was prepared by Dr. Melissa Weldon-Padera, a psychologist. The purpose

of the evaluation is to determine whether defendant has made "sufficient treatment progress so

that he is no longer sexually dangerous and that he can function outside of the institution where

he's been residing."

¶ 6        Dr. Weldon-Padera testified she was a psychologist specializing in evaluating sex

offenders. She is a "qualified evaluator" in Illinois under section 4.01 of the Act (725 ILCS

205/4.01 (West 2016)). Dr. Weldon-Padera proceeded to testify as to her evaluation and

interview.

¶ 7        Dr. Weldon-Padera testified defendant was cooperative with the interview and

polite. Dr. Weldon-Padera noted defendant demonstrated poor insight and limited judgment.

Comparing previous records with defendant's statements during the interview, Dr. Weldon-

Padera noted defendant had provided very inconsistent information and his statements during the

interview "needed to be interpreted with caution since they may not have been entirely truthful

or correct."

¶ 8        Dr. Weldon-Padera proceeded to review her conversation with defendant regarding his sexual offending history. According to Dr. Weldon-Padera, this is an important factor in sexual recidivism. Dr. Weldon-Padera stated, "We don't just look at an arrest or conviction, we want to look at his pattern of behavior over time." Dr. Weldon-Padera relied on defendant's criminal history as well as his admissions over time. Dr. Weldon-Padera testified defendant was committed in 1987 after he was charged with three counts of aggravated criminal sexual assault, where defendant was 16 at the time of the offense and the victims were ages 8, 10, and 12. During the interview, defendant admitted he molested the victims but left out other facts and details. Defendant also acknowledged in the interview he had three additional victims. Dr. Weldon-Padera stated the number of self-reported victims defendant had acknowledged "fluctuated over time," as defendant had previously reported having 7 additional victims and also reported having as many as 20 total victims.

¶ 9        Dr. Weldon-Padera testified as to defendant's disciplinary history while incarcerated. Defendant had acquired 81 disciplinary tickets involving 117 separate infractions. Dr. Weldon-Padera noted disciplinary records were missing for a period of time of "a little over four years[.]" Two of defendant's disciplinary tickets were for sexual misconduct, one for attempted sexual misconduct, and one for solicitation and conspiracy of sexual misconduct. Defendant's last sexual misconduct ticket was in 2015. Separate from his disciplinary tickets, defendant has received approximately 270 tickets from treatment program staff. Dr. Weldon-Padera stated those tickets were mostly for failing to attend therapy groups or not completing homework assignments. Dr. Weldon-Padera testified as to program tickets, "a lot of times those tickets result in being placed on a probation or suspension from the treatment program."

¶ 10        Dr. Weldon-Padera testified as to defendant's significant background information and personal history. Defendant described his childhood to Dr. Weldon-Padera as " 'very argumentative and very violent[.]' " He also indicated he had been sexually abused twice, once by his sister's older female friend and once by an adult male friend of the family. Defendant completed the tenth grade but was in eleventh grade when he was arrested for the offenses that ultimately led to his confinement. He has completed some vocational courses but has not obtained his General Equivalency Degree (GED). Defendant described himself in high school as a "very violent person." He identified his sister and half-brother as the most important people in his life, though he has had very limited contact with them.

¶ 11        Dr. Weldon-Padera considered defendant's sexual history. Defendant recalled his first sexual experience occurred when he was nine years old. At the age of 12, defendant's father bartered for a prostitute to have sex with defendant. He reported having more than 20 sexual partners as an adolescent. Defendant confessed he viewed "a lot" of pornographic materials while committed. He reported he had 9 to 12 sexual partners as an adult in the Department of Corrections (DOC). Previously, defendant had told evaluators he had 20 sexual partners in DOC with more than 150 contacts. Defendant described his current sexual fantasies, which involved two ex-girlfriends. Dr. Weldon-Padera testified defendant admitted after "much prompting" that, in his fantasies, the girlfriends are the age when defendant last saw them and defendant spontaneously commented, "I do like them young because they're more wild." While incarcerated, defendant had engaged in frotteurism, exhibitionism, and voyeurism. Defendant admitted he would intentionally rub up against female staff and, on one occasion, touched the breast and buttocks of a female staff member. Defendant also admitted intentionally exposing himself to female staff, masturbating in their presence, or urinating when he knew female staff

would be present. Dr. Weldon-Padera also noted defendant has been known to intentionally pretend to drop an item on the ground and try to peer up a female staff's skirt or dress.

¶ 12          Dr. Weldon-Padera testified as to defendant's sex offender treatment history. She explained sex offender treatment is the "biggest protective factor" as research has shown it is "the only thing that someone can actively do themselves to reduce their risk." She testified defendant's involvement in the sex offender treatment program has been inconsistent over his incarceration. Defendant had periods where he dropped out of the program for years at a time. However, defendant had been attending group therapy more consistently over the previous year. Dr. Weldon-Padera received information from defendant's primary therapist on defendant's participation in therapy. Defendant participates in therapy, but many of his comments are off-topic or include inappropriate jokes, indicating he is not taking therapy as seriously as he should. His primary therapist also told Dr. Weldon-Padera she had not seen defendant make any treatment progress since his last recovery evaluation in 2011. Dr. Weldon-Padera explained the treatment program consists of four phases. Defendant was in phase one, the "initial treatment phase." At one point, defendant progressed to phase two of treatment but was placed back in phase one after exhibiting "more behaviors and attitudes of phase [one.]" In his most recent semiannual program evaluation, out of 29 treatment targets, defendant was rated as "need for improvement" on 3 targets, "considerable need for improvement" on 11 targets, and "very considerable need for improvement" on the remaining 15 targets. Defendant had a partial understanding of core issues and was able to cite some of his own core issues, but Dr. Weldon-Padera stated it was apparent defendant had not completely resolved or managed his core issues.

¶ 13          Dr. Weldon-Padera diagnosed defendant with (1) pedophilic disorder, nonexclusive type, sexually attracted to males; (2) cannabis use disorder, severe in a controlled

environment; and (3) antisocial personality disorder. She explained, to be diagnosed with pedophilic disorder, defendant showed he (1) had recurrent intense, sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children for at least 6 months; (2) had acted on these sexual urges; and (3) was at least 16 years of age and at least 5 years older than the victim at the time of the offense. Dr. Weldon-Padera explained pedophilic disorder is a chronic and lifelong condition that "doesn't just go away spontaneously[.]" Although there is no cure, a person can learn how to control and manage the disorder through treatment.

¶ 14     As a part of Dr. Weldon-Padera's evaluation, she completed a risk assessment of defendant's likelihood to reoffend. She calculated defendant's risk to reoffend using the Static-99R test, which considers historical and unchangeable factors to assess sex offender risk, based on factors such as demographic information, criminal history, and victim information. Defendant scored in the above-average risk for reoffending in comparison to other sex offenders.

¶ 15     Dr. Weldon-Padera also considered dynamic factors using the Stable-2007 test, used to predict recidivism and assess treatment needs. The Stable-2007 test uses factors such as defendant's personality characteristics, skill deficits, and learned behaviors to assess recidivism risk. Defendant scored as high risk, with his score placing him in the top 92 percent of sex offenders in likelihood to reoffend. Defendant was in the highest category, requiring the highest level of supervision and the highest level of intense treatment.

¶ 16     Dr. Weldon-Padera considered other dynamic factors beyond the Stable-2007 test which applied to defendant, which she stated were sexual preference for children, sexualized violence, Machiavellianism, and substance abuse. She defined Machiavellianism as "the

individual views others as being weak or easily manipulated and has an interpersonal strategy where they think or view it as being appropriate to take advantage of others."

¶ 17    Based on all this information, Dr. Weldon-Padera concluded (1) defendant suffered from one or more mental disorders, (2) he has suffered from these mental disorders since at least 1985, (3) defendant's mental disorders would lead to his propensity to commit sex offenses, (4) it is substantially probable defendant would commit additional sex offenses if not committed or confined, and (5) there are no conditions or restrictions the court could impose to keep the community safe if defendant were released.

¶ 18    The jury returned a verdict finding defendant remained a sexually dangerous person.

¶ 19    This appeal followed.

¶ 20                    II. ANALYSIS

¶ 21    Section 9(a) of the Act (725 ILCS 205/9(a) (West 2016)) provides: "An application in writing setting forth facts showing that the sexually dangerous person *** has recovered may be filed before the committing court." In a hearing on the application, "[t]he sexually dangerous person or the State may elect to have the hearing before a jury," and "[t]he State has the burden of proving by clear and convincing evidence that the applicant is still a sexually dangerous person." 725 ILCS 205/9(b) (West 2016).

¶ 22    The State has the burden of proving, by clear and convincing evidence, the civilly committed person still meets the statutory definition of a sexually dangerous person. *Id.* The statutory definition of a sexually dangerous person consists of four elements: (1) the defendant suffers from a mental disorder; (2) the defendant has suffered from the mental disorder for a year or longer; (3) the mental disorder is accompanied by criminal propensities to the commission of

sex offenses; and (4) the defendant has demonstrated propensities toward acts of sexual assault or sexual molestation of children under the age of 18 (725 ILCS 205/1.01 (West 2016)).

¶ 23    The jury's finding a defendant remained a sexually dangerous person will not be disturbed on review unless that decision is against the manifest weight of the evidence. *People v. Donath*, 2013 IL App (3d) 130251, ¶ 38, 986 N.E.2d 1222. "A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent." *Id.*

¶ 24    Dr. Weldon-Padera evaluated defendant and reached the conclusion he remained a sexually dangerous person in need of confinement. Defendant's diagnosis of pedophilic disorder, cannabis use disorder, and antisocial personality disorder, along with defendant's behavioral issues and dynamic risk factors support the jury's finding defendant had a mental disorder. Defendant had a history of sexual offenses against children, as outlined by Dr. Weldon-Padera in her evaluation and testimony. Defendant had not taken significant action towards recovery, with inconsistent participation in treatment throughout his confinement, and, despite a modicum of progress for a brief period, defendant remains in stage one of the four stages of treatment. His primary therapist reported defendant has not progressed in treatment since his last evaluation in 2011 and he was rated as considerable need and very considerable need for improvement on 26 of the 29 factors in his most recent treatment evaluation. Treatment is at the core of recovery for defendant and, according to Dr. Weldon-Padera, the biggest protective factor. See *People v. Trainor*, 196 Ill. 2d 318, 323-24, 752 N.E.2d 1055, 1058-59 (2001) ("The Act's purpose is *** to subject sexually dangerous persons to treatment such that the individual may recover from the propensity to commit sexual offenses and be rehabilitated."). Dr. Weldon-Padera opined defendant remained sexually dangerous, had a substantial likelihood of reoffending, and there are no conditions or restrictions the court could impose to keep the

community safe if defendant were released. Nothing in the record refutes Dr. Weldon-Padera's opinions, which formed the basis of the jury's verdict. The jury's verdict was not manifestly erroneous.

¶ 25      As the jury's determination was not manifestly erroneous, the circuit court did not err in denying defendant's request for discharge nor in denying defendant's request for conditional release.

¶ 26                                III. CONCLUSION

¶ 27      We affirm the circuit court's denial of defendant's motion for discharge or conditional release.

¶ 28      Affirmed.