# Illinois Official Reports

## Appellate Court

---

### *People v. Kallal*, 2019 IL App (4th) 180099

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JACOB D. KALLAL, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-18-0099 |
| Filed | April 26, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 01-CF-403; the Hon. John M. Madonia, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | William L. Vig, of Vig Law, P.C., of Springfield, for appellant.<br><br>Daniel K. Wright, State's Attorney, of Springfield (Patrick Delfino, David J. Robinson, and James Ryan Williams, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE TURNER delivered the judgment of the court, with opinion.<br>Justices Steigmann and Harris concurred in the judgment and opinion. |

**OPINION**

¶ 1        In November 2017, a jury found defendant, Jacob D. Kallal, remained a sexually dangerous individual pursuant to the Sexually Dangerous Persons Act (Act) (725 ILCS 205/0.01 to 12 (West 2016)). Defendant appeals, arguing the trial court erred in the following ways: (1) it failed to bar the State from calling one of defendant's treatment providers, (2) it restricted defendant's cross-examination of the State's expert witness, (3) it failed to enter a judgment notwithstanding the verdict because the jury verdict form did not include an explicit finding it was "substantially probable" respondent would engage in a future sex offense if not confined, and (4) it failed to declare a mistrial based on the State's closing argument. Defendant also argued the State's evidence was insufficient to establish defendant was still sexually dangerous. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3        On July 16, 2001, defendant was declared a sexually dangerous person and committed to the custody of the director of the Illinois Department of Corrections (DOC). On July 20, 2015, he filed an application for discharge or conditional release from DOC. On January 14, 2016, the State filed a socio-psychiatric report prepared by Dr. Melissa Weldon-Padera.

¶ 4        In August 2016, a jury trial was held on defendant's discharge application. The jury could not reach a verdict, and the trial court declared a mistrial.

¶ 5        In November 2017, defendant had a second jury trial on his application to be discharged from DOC confinement. Defendant filed a motion *in limine*, asking the trial court to bar the State from introducing the testimony of Heather Young, a special-offender program therapist who treated defendant at Big Muddy Correctional Center (Big Muddy), because her testimony violated section 9(a) of the Act (725 ILCS 205/9(a) (West 2016)). The trial court denied defendant's motion.

¶ 6        Dr. Melissa Weldon-Padera, a psychologist, testified she completed a comprehensive evaluation of defendant to determine whether he was still sexually dangerous in January 2016, which she documented in a report dated January 12, 2016. She updated the evaluation on January 4, 2017. For the updated evaluation, she reviewed defendant's records since the last evaluation and spoke to his primary therapist about any progress he had made since the last evaluation.

¶ 7        Before Dr. Weldon-Padera wrote her first report dated January 12, 2016, she spoke with defendant on January 5, 2016, for three hours. He was cooperative, polite, and soft-spoken. His thought content was slightly concrete, but his insight and judgment were fair. His intellectual functioning was below average. She did not interview him again for the updated evaluation. Defendant admitted committing the offenses for which he was charged but did not accept full responsibility for his actions.

¶ 8        The doctor testified it is important for an individual like defendant to accept responsibility because he is then able to learn and understand his offense cycle, victim empathy, what triggers his sexual interests, and what his high-risk factors are. Defendant did not seem to understand his assault cycle, which was an important factor to keep him from reoffending. Defendant also had five disciplinary tickets with seven infractions, including a ticket in 2008 for masturbating

in the library at Big Muddy while watching a female employee, and numerous program tickets specific to his treatment program.

¶ 9　　Dr. Weldon-Padera also reviewed defendant's sexual-offense history, which she said was an important factor in determining sexual recidivism and an individual's pattern over a period of time. Defendant had a criminal history. In 1997, when he was 18, the State charged defendant with public indecency for exposing himself and masturbating in front of a woman (age 18) he did not know, a similar act involving another female stranger (age 35), and masturbating in front of a teenage female stranger (age 15). In 2001, he was charged with theft from a person and public indecency involving another female stranger (age 72). Two months after that incident, he was charged with indecent solicitation or abuse of a child under age 13, sexual exploitation of a child, public indecency, battery, and obscenity.

¶ 10　　The victims in this last case were two young girls, each only eight years old. Defendant approached the girls on his bicycle, showed them a pornographic picture and asked them if they could do what was depicted. He then unzipped his pants, exposed his penis, and began masturbating. Defendant then grabbed one of the girls by the back of her head and pulled her head toward his penis. The girl hit defendant, and the two girls escaped. As a result of this last offense, defendant was declared a sexually dangerous person based on two counts of indecent solicitation of a child and one count of attempt (predatory criminal sexual assault of a child). He was 22 at the time.

¶ 11　　Dr. Weldon-Padera also noted defendant was accused of or investigated for other uncharged incidents. In 2001, he was accused of two other incidents involving public indecency and disorderly conduct for exposing himself to two female employees at a dry cleaning business. In 2006, defendant was investigated for aggravated criminal sexual assault against a seven-year-old female acquaintance. The alleged victim in that case accused him of forcing her to perform oral sex on him. From the doctor's testimony, it was unclear when this actually occurred but presumably it was before defendant was placed in DOC custody.

¶ 12　　Defendant's criminal history also included arrests for retail theft, residential burglary, attempt (residential burglary), criminal trespass to land, criminal damage to property, and domestic battery. Dr. Weldon-Padera stated these incidents were related to defendant's antisocial personality disorder and led to a higher risk of recidivism. Defendant also violated probation on two occasions, one in 1998 and one in 2001.

¶ 13　　The doctor also reviewed defendant's history of sexual offense treatment, which she said was one of the most important things an offender can do to reduce his risk of reoffending. Defendant was participating in treatment at Big Muddy. However, the staff at Big Muddy indicated he did not consistently attend groups and sometimes missed group meetings to attend and referee sporting events. He had recently been removed from one group due to his lack of attendance.

¶ 14　　According to Dr. Weldon-Padera, defendant appeared to have made some progress while at Big Muddy but not between her initial evaluation in 2016 and the updated evaluation in 2017. When she first evaluated defendant, he was in the second of four phases of treatment at Big Muddy. At the time she updated the evaluation, defendant had been moved back to the first, or lowest, phase of treatment. She reviewed defendant's semiannual program evaluations, which included 29 categories where his progress was assessed. He showed no need for improvement in one category, some need for improvement in one category, considerable need

for improvement in 16 categories, and very considerable need for improvement in 11 categories.

¶ 15 Dr. Weldon-Padera used an adjusted actuarial approach to assess the likelihood defendant would commit another sexual offense if released. This method starts with a baseline determined by an actuarial risk assessment. She also considers clinically significant risk factors to form her overall opinion. The Static-99R is an actuarial risk-assessment tool she used to evaluate defendant based on historical and unchangeable factors. Defendant scored an "8" on this test, which placed him in the "well above average category" to reoffend. Compared to other sex offenders, defendant was 7.3 times more likely to reoffend than an average sex offender according to this assessment tool. According to the Static-99R, 98.5% of sex offenders would be less likely than defendant to reoffend. To evaluate defendant's dynamic risk factors, which are psychological variables that can be changed with intervention in treatment, Dr. Weldon-Padera used the Stable 2007 assessment tool. Defendant scored a "13" on this test, which placed him in a high-risk category.

¶ 16 When she examined the Static-99R and the Stable 2007 together, defendant was placed in the "well above average priority category," which was for individuals most in need of supervision and intervention. Dr. Weldon-Padera opined defendant's exhibitionistic disorder is coupled with a propensity to commit sex offenses. It was substantially probable defendant would commit additional sex offenses if he did not remain confined. He continued to be a sexually dangerous individual in need of confinement. She stated the court could appoint no conditions or restrictions on defendant to keep the community safe if defendant was released from Big Muddy.

¶ 17 Heather Young, a special-offender program therapist at Big Muddy, also testified on behalf of the State. Defendant objected to Young's testimony. The trial court overruled defendant's objection. Young provided treatment to individuals who have been deemed sexually dangerous persons by the State. She worked with defendant at Big Muddy and was currently his primary therapist.

¶ 18 Defendant chose to not testify.

¶ 19 The jury found defendant remained sexually dangerous. This appeal followed.

¶ 20 II. ANALYSIS

¶ 21 Defendant presents a variety of arguments challenging the results of the trial where the jury found he was still sexually dangerous. We do not address these arguments in the order presented by defendant.

¶ 22 A. Cross-Examination of Dr. Weldon-Padera

¶ 23 We first address defendant's argument the trial court erred by restricting his cross-examination of the State's expert witness, Dr. Weldon-Padera. Defendant points out the doctor testified sex-offender treatment was an important protective factor on direct examination. To impeach her testimony, respondent wanted to question her regarding a 2015 article from the Journal of Experimental Criminology titled, *The Effects of Sexual Offender Treatment on Recidivism: An International Meta-Analysis of Sound Quality Evaluations*. The article was authored by two individuals only identified during the trial as Schmucker and Lösel. Their meta-analysis found treatment prisoners received while in custody did not have a statistically

significant effect on their recidivism rates. Dr. Weldon-Padera acknowledged Schmucker and Lösel were experts in the field and the Journal of Experimental Criminology was a peer-reviewed publication. However, she was not familiar with this particular article.

¶ 24 The State objected to defendant's use of this article to cross-examine the doctor because she lacked personal knowledge of the article. The trial court agreed, stating, "she hasn't seen the study, she hasn't used it to form any basis of any opinion whatsoever. This is simply getting a bunch of hearsay from some other study that isn't a part of this case before this jury, and I'm sustaining this objection." Defendant later argued he should be able to impeach Dr. Weldon-Padera with the article because she conceded the competence of the authors. The trial court stated, "Author's competence in one study doesn't mean the treatise that you're showing her she believes is a reliable authority. No, I'm—no, I'm not allowing you to bootstrap this evidence into this case right now."

¶ 25 Defendant cites our supreme court's decision in *Darling v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326, 335-36, 211 N.E.2d 253, 259 (1965), to support his argument the trial court erred in denying defendant the ability to impeach Dr. Weldon-Padera with this article. In *Darling*, our supreme court stated "[t]o prevent cross-examination upon the relevant body of knowledge serves only to protect the ignorant or unscrupulous expert witness." *Darling*, 33 Ill. 2d at 336. The court also stated, "[i]n our opinion expert testimony will be a more effective tool in the attainment of justice if cross-examination is permitted as to the views of recognized authorities, expressed in treatises or periodicals written for professional colleagues." *Darling*, 33 Ill. 2d at 336.

¶ 26 Citing *Stapleton v. Moore*, 403 Ill. App. 3d 147, 156, 932 N.E.2d 487, 496 (2010), the State argues a defendant is not entitled to reversal based on an evidentiary error limiting cross-examination unless the error was substantially prejudicial and affected the outcome of the trial. Because defendant did not claim he was prejudiced or explain how he was prejudiced by the trial court not allowing him to question defendant with the article, the State argues defendant forfeited this issue pursuant to Illinois Supreme Court Rule 341(h)(7) (eff. Nov. 1, 2017). We agree.

¶ 27 Regardless of forfeiture, we do not see how defendant was prejudiced by the trial court's ruling not allowing him to impeach the expert with an article that concludes in-custody treatment has no statistical effect on recidivism rates. This article does not counter the State's position defendant is still a sexually dangerous individual. Further, defense counsel was allowed to get this information into the case by questioning the doctor about a 2005 study that showed community treatment had a statistically significant effect on recidivism but institutional treatment did not.

¶ 28                                   B. Testimony of Heather Young

¶ 29 We next address defendant's argument the trial court erred in allowing Heather Young, who was defendant's primary therapist at Big Muddy at the time of the hearing, to testify at defendant's trial. According to defendant, the court's decision allowing Young to testify violated section 9 of the Act (725 ILCS 205/9(a) (West 2016)) because the Act limits the type of evidence the State may introduce with regard to an application for discharge. Defendant makes no argument how he suffered any actual prejudice from Young's testimony.

¶ 30 Section 9 of the Act states:

"An application in writing setting forth facts showing that the sexually dangerous person or criminal sexual psychopathic person has recovered may be filed before the committing court. Upon receipt thereof, the clerk of the court shall cause a copy of the application to be sent to the Director of the Department of Corrections. The Director shall then cause to be prepared and sent to the court a socio-psychiatric report concerning the applicant. The report shall be prepared by an evaluator licensed under the Sex Offender Evaluation and Treatment Provider Act [(225 ILCS 109/1 *et seq.* (West 2016))]. The court shall set a date for the hearing upon the application and shall consider the report so prepared under the direction of the Director of the Department of Corrections and any other relevant information submitted by or on behalf of the applicant." 725 ILCS 205/9(a) (West 2016).

¶ 31     According to defendant, the State was limited to only introducing the report prepared under the direction of the DOC. Defendant points out Young neither authored the report nor testified about the report's content or conclusions. Defendant cites our supreme court's decision in *People v. Grant*, 2016 IL 119162, ¶ 20, 52 N.E.3d 308, for the proposition that "although proceedings under the [Act] are civil in nature, the possibility of indefinite confinement for a sexually dangerous person means that the [Act] must be given the same strict construction as penal statutes." The court also stated, "In sum, while the [Act] quite clearly allows a respondent in a sexually dangerous persons proceeding to retain a private expert witness [citation], there is nothing in the plain language of the [Act] allowing the State to do so, and the [Act] must be strictly construed [citation]." *Grant*, 2016 IL 119162, ¶ 32.

¶ 32     This case is distinguishable from *Grant*. In *Grant*, the supreme court ruled section 9 of the Act does not give the State the right to hire an independent psychiatric expert of its choosing because it disagreed with the report prepared by DOC's evaluator. In this case, the State neither wanted to hire an independent psychiatric expert nor disagreed with DOC's evaluator's report. Further, the supreme court declined to rule whether the trial court erred in denying Grant's motion *in limine* to preclude the testimony of certain witnesses, which is the issue in this case. *Grant*, 2016 IL 119162, ¶ 34. While it is easy to see why the State should not be able to bring in a new expert witness simply because it did not agree with the opinion of the expert chosen by the DOC, we do not believe our supreme court's holding should be expanded to restrict the State from introducing any other evidence.

¶ 33                              C. State's Closing Argument

¶ 34     Defendant also argues the trial court erred by not declaring a mistrial based on allegedly improper statements the State made during its closing argument. Defendant concedes he did not move for a mistrial. However, he argues we should review the issue pursuant to the plain-error doctrine. We disagree as the State's closing argument did not warrant a mistrial in any way. Any misstatements by the State did not substantially prejudice defendant.

¶ 35     "[P]rosecutors are afforded wide latitude in closing argument [citations] and may argue facts and reasonable inferences drawn from the evidence [citation]." *People v. Williams*, 192 Ill. 2d 548, 573, 736 N.E.2d 1001, 1015 (2000). "In reviewing a challenge to remarks made by the State during closing argument, the comments must be considered in the context of the entire closing statements of the parties." *Williams*, 192 Ill. 2d at 573. Improper remarks during closing argument are reversible error only when they cause substantial prejudice to the defendant. *Williams*, 192 Ill. 2d at 573. Substantial prejudice occurs if the improper remarks

were a material factor in the defendant's conviction. *People v. Thompson*, 2013 IL App (1st) 113105, ¶ 79, 997 N.E.2d 681. "If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted." *People v. Wheeler*, 226 Ill. 2d 92, 123, 871 N.E.2d 728, 745 (2007). A trial court can cure erroneous statements made during arguments by giving proper jury instructions on the law to be applied, telling the jury arguments are not evidence and should be disregarded if not supported by the evidence, or by sustaining an objection and instructing the jury to disregard the improper statement. *People v. Simms*, 192 Ill. 2d 348, 396-97, 736 N.E.2d 1092, 1124-25 (2000).

¶ 36    Defendant first takes issue with the State commenting on an uncharged incident with a child reported in 2006. Defense counsel did object to this comment by the State. The trial court sustained the objection, struck the State's comment, and ordered the jury not to consider the reported incident. As to this statement, if the statement constitutes error, the trial court cured the error when it struck the comment and instructed the jury not to consider the reported incident.

¶ 37    Defendant also argues the State misstated the facts of one of defendant's cases that caused the initial sexually dangerous person petition to be filed against defendant. Referencing this case, the State said defendant went from someone who engaged in public masturbation to grabbing children off the street. Defendant objected to this statement, arguing it was only a single child. The State responded it was two children. Defense counsel then stated it was only a single grab.

¶ 38    Considering what happened during the incident in question, defendant cannot establish he was prejudiced by the State's assertion during its closing argument defendant grabbed children off the street during the incident in question. Defendant does not contest on appeal the State presented evidence defendant approached two eight-year-old girls, showed them pornography, asked them if they could do what was depicted, exposed his penis, and began masturbating in front of the girls. Defendant also does not dispute the State presented evidence he grabbed one of the two young girls and tried to pull her head toward his penis. Instead, he argued he was prejudiced because the State implied he grabbed both of the girls when he only grabbed one of them.

¶ 39    Defendant was not prejudiced by the State's comment. Defendant admitted propositioning and masturbating in front of two eight-year-old girls. The fact he only tried to pull the head of one of the girls toward his penis instead of both girls does not help his cause.

¶ 40    Defendant also argues the State misstated its burden of proof in this case. We disagree. The State consistently stated the correct burden of proof, and the trial court instructed the jury on the correct burden of proof. Defendant complains about the State's comment defendant's chance of reoffending was like the flip of a coin. However, this comment may have benefitted defendant considering the jury instructions made clear the jury had to find a substantial probability defendant would commit another sexual offense if released.

¶ 41                            D. Sufficiency of the Evidence

¶ 42    We next address defendant's argument the State failed to present sufficient evidence defendant remained a sexually dangerous person. We will not disturb the jury's verdict unless it was against the manifest weight of the evidence. *People v. Donath*, 2013 IL App (3d) 120251,

¶ 38, 986 N.E.2d 1222. A decision is against the manifest weight of the evidence if the opposite decision is clearly apparent. *Donath*, 2013 IL App (3d) 120251, ¶ 38. Based on the evidence in this case, a finding defendant was still sexually dangerous was not against the manifest weight of the evidence.

¶ 43        Defendant focuses on Dr. Weldon-Padera's testimony that defendant's chance of reoffending over the next five years was only around 40% according to a combined analysis of the Static-99R assessment test and the Stable 2007 assessment test. However, the jury was not only concerned with the next five years. Further, the jury was not required to accept this statistic, and the statistic did not guarantee the likelihood of defendant reoffending. Finally, regardless of the 40% statistic, Dr. Weldon-Padera testified a substantial probability existed defendant would reoffend. Her opinion was based on more information than just these two assessment tools.

¶ 44        According to Dr. Weldon-Padera, defendant's score on the Static-99R assessment placed him in the well above-average category to reoffend. Defendant was over seven times more likely to reoffend than the average or typical sex offender. His score on the Stable 2007 placed him in the high-risk category to reoffend. Further, when the Stable 2007 and Static-99R are considered together, his composite assessment placed him in the well above-average priority category, which is the category for individuals who need the most supervision and intervention.

¶ 45        While defendant admitted he committed the offenses for which he was charged, Dr. Weldon-Padera noted he failed to accept full responsibility. He minimized his actions and did not seem to understand his assault cycle. This increased his risk of reoffending. Defendant also had an incomplete intellectual understanding of victim empathy and a poor understanding of his sexual attraction to the deviant acts and behaviors in which he engaged.

¶ 46        Dr. Weldon-Padera testified it was her opinion defendant had not recovered from being a sexually dangerous person to the extent he could be released into the community. He continued to be sexually dangerous and in need of confinement because he remained a high risk to reoffend. Based on the evidence in this case, we will not say the fact finder's decision was against the manifest weight of the evidence.

¶ 47                              E. Judgment Notwithstanding the Verdict

¶ 48        Defendant next argues the trial court erred by not entering a judgment notwithstanding the verdict because the jury failed to make an explicit finding it was "substantially probable" defendant would commit a sex offense in the future if not confined. Defendant relies on our supreme court's decision in *People v. Masterson*, 207 Ill. 2d 305, 798 N.E.2d 735 (2003), which involved a bench trial and an initial commitment. In *Masterson*, the supreme court did state "a finding of sexual dangerousness *** must hereafter be accompanied by an explicit finding that it is 'substantially probable' the person subject to the commitment proceeding will engage in the commission of sex offenses in the future if not confined." *Masterson*, 207 Ill. 2d at 330. This element was not included in the statutory definition of sexual dangerousness found in section 1.01 of the Act (725 ILCS 205/1.01 (West 2016)). *Masterson*, 207 Ill. 2d at 330.

¶ 49        While a trial court is normally presumed to know the law, the supreme court likely was concerned some trial courts might only look to section 1.01 of the Act (725 ILCS 205/1.01 (West 2016)) to determine what constitutes "sexual dangerousness" and fail to consider the additional substantial probability element, which is not part of section 1.01 but was determined by the supreme court to be a necessary element. In a bench trial, without the trial court judge

making an explicit finding it is "substantially probable" the defendant will engage in the commission of sex offenses in the future if not confined, neither a defendant nor a reviewing court could safely assume the trial court considered this additional required element of a sexual dangerousness finding.

¶ 50 This problem does not exist in a jury trial. A defendant and a reviewing court will know whether the jury knew it was required to find this element of sexual dangerousness by looking at the jury instructions. In this case, the jury was properly instructed it had to determine it was a substantial probability defendant would reoffend in the future if released before it could find he continued to be sexually dangerous. As a result, we find no need to expand the supreme court's bench trial requirement to a jury trial on a defendant's recovery petition if the jury has been properly instructed on this point of law.

¶ 51 While not entirely clear, it appears defendant also contends the jury had to make an explicit finding that it considered whether defendant had a condition affecting his volitional capacity. The supreme court in *Masterson* did not include such a requirement even in bench trials, let alone jury trials. Defendant does not argue the jury was not properly instructed in this case. As a result, we give no further consideration to this argument. The trial court did not err by not granting defendant a judgment notwithstanding the verdict.

¶ 52                                   III. CONCLUSION
¶ 53 For the reasons stated, we affirm the jury's decision defendant remained a sexually dangerous person who needed to be confined.

¶ 54        Affirmed.