NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190663-U

NO. 4-19-0663

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 24, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| JULIAN CHRISEAN RHODES, | ) | No. 16CF561 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Casey Costigan, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Presiding Justice Knecht and Justice Holder White concurred in the judgment.

**ORDER**

¶ 1 *Held:* The appellate court affirmed defendant's conviction because the evidence was not closely balanced and the State's closing argument was not improper.

¶ 2 In September 2016, a jury found defendant, Julian Chrisean Rhodes, guilty of delivering a controlled substance within 1000 feet of a church. 720 ILCS 570/407(b)(2) (West 2014). The trial court sentenced defendant to eight years in prison and imposed various fines and fees.

¶ 3 Defendant appealed, arguing, among other things, the trial court erred by failing to conduct a hearing on his *pro se* claim of ineffective assistance of counsel. We agreed with defendant and remanded the case for a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984). *People v. Rhodes*, 2019 IL App (4th) 160917, ¶ 20, 128 N.E.3d 1100.

¶ 4 On remand, the trial court conducted a hearing and explained the procedure it would

follow if defendant wished to argue his ineffective assistance claim. Defendant stated that "it's a moot point" because he was less than 90 days from being released. The court then asked defendant if he wished to continue his prior appeal so this court could address his remaining claims on their merits. Defendant stated that he did, and the court filed a notice of appeal.

¶ 5        On appeal, defendant advances two of the arguments he asserted in his prior appeal: (1) the trial court failed to ensure the jury understood and accepted the Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) principles and (2) the prosecutor made an improper closing argument. We conclude that (1) defendant forfeited these issues by failing to raise them in a posttrial motion and (2) the plain error doctrine does not excuse the forfeiture because the evidence was not closely balanced. Accordingly, we affirm the trial court's judgment.

¶ 6                        I. BACKGROUND

¶ 7                    A. The Trial Court Proceedings

¶ 8                        1. *The Charges*

¶ 9        In May 2016, the State charged defendant with delivery of a controlled substance within 1000 feet of a church (720 ILCS 570/407(b)(2) (West 2014)) and delivery of a controlled substance (*id.* § 401(d)(i)). The State alleged defendant delivered less than one gram of a substance containing cocaine to a confidential informant working with the Bloomington Police Department within 1000 feet of Faith Baptist Church.

¶ 10                        2. *Voir Dire*

¶ 11        In September 2016, the trial court conducted defendant's jury trial. During *voir dire*, the court admonished the prospective jurors regarding the four principles set forth in Illinois Supreme Court Rule 431(b), commonly referred to as the *Zehr* principles. See *People v. Zehr*, 103 Ill. 2d 472, 477, 469 N.E.2d 1062, 1064 (1984). After stating each principle, the court

asked the panel, as follows: "Is there anyone here who does not understand that proposition of law? If so, raise your hand. *** Is there anyone here who disagrees with that proposition of law? If so, raise your hand."

¶ 12        The State asked questions pertaining to jurors' experiences with people addicted to drugs and the police. One representative example is as follows:

"MR. HORVE: In any event, you are not going to believe a police officer just because he's a police officer?

[POTENTIAL JUROR]: No. Give him a fair chance.

MR. HORVE: You are going to weigh his credibility the same as you would anyone else, correct?

[POTENTIAL JUROR]: Yes.

MR. HORVE: And, likewise, a person who has an addiction, you are not going to discount them immediately just because they have problems?

[POTENTIAL JUROR]: No, I will not discount them.

MR. HORVE: What if they're a felon?

[POTENTIAL JUROR]: I'll try to be honest, yeah.

MR. HORVE: Can you weigh the credibility of people in light of all the evidence?

[POTENTIAL JUROR]: Yeah.

MR. HORVE: Likewise, can everyone else promise me they'll do the same thing? A lot of head nodding. Great. Thank you very much."

¶ 13                                3. *The Jury Trial*

¶ 14        Carrie Robbins testified that she had lived in McLean County for the last five years.

Robbins admitted she (1) had a drug problem, (2) had used crack cocaine for the past 13-14 years, (3) lied to her family and friends because of her addiction, and (4) had last used in July 2016. Robbins further admitted that she had multiple felony convictions, including one for forgery. Most recently, Robbins was convicted for aggravated battery in July 2015, and she had been on probation for that offense in McLean County for the last year.

¶ 15　　　　Robbins stated she worked as a police informant with Detective Jared Bierbaum. The police paid Robbins in exchange for names, phone numbers, controlled buys, and testimony. Robbins did 30 buys with Bierbaum and had worked with him since December 2014.

¶ 16　　　　On May 23, 2016, Robbins contacted Bierbaum and told him she could buy crack cocaine from Sean Hubbard. Robbins went with Bierbaum to a restaurant parking lot in downtown Bloomington. While sitting in the car, Robbins contacted Hubbard and arranged a buy. After searching Robbins, Bierbaum gave her $100 and a "phone with a camera on it," and Robbins walked to a Thornton's gas station across the street where she waited outside for about 30 minutes.

¶ 17　　　　Robbins testified that Hubbard arrived driving a tan Buick with defendant sitting in the passenger seat. Robbins walked up to the passenger side of the car and saw defendant holding crack. Robbins had never seen defendant before, so she looked at Hubbard, who nodded towards defendant. Robbins gave defendant the money and received a package of crack. Hubbard and defendant drove off, while Robbins walked back to the parking lot and Bierbaum. Once there, she handed Bierbaum the crack and told him what happened. The State played a video that Robbins recorded of the transaction. The video showed Robbins handing defendant money but did not show defendant handing Robbins anything in return. The video further showed Robbins walking to Bierbaum's car, which was parked on a residential street across from the gas station.

¶ 18　　　　On cross-examination, Robbins acknowledged that she started working with

Bierbaum in 2014 to avoid being arrested for possessing drug paraphernalia. She further acknowledged that she previously used heroin and methamphetamine. Robbins agreed that she had made nearly $4000 while working as a confidential informant and was paid $105 for her cooperation on May 23, 2016.

¶ 19 Robbins further discussed her criminal history while working as a confidential informant. In 2015, Robbins was charged with aggravated battery of a police officer and was placed on probation. Robbins denied that her work as an informant had anything to do with why she received probation. Robbins stated she was later arrested and charged with a misdemeanor battery but the State dismissed the charges when witnesses did not appear on the day of trial. Robbins claimed she relapsed only once and agreed it was a violation of her probation that could result in prison time. Robbins again insisted that her confidential informant work had no impact on the State's handling of her probation.

¶ 20 On cross-examination, defendant asked Robbins if she was familiar with the location of the buy and the search process. Robbins testified that she had conducted controlled buys at the Thornton's on prior occasions. Defendant asked Robbins if she knew where Bierbaum would search her and where he would not search her. Robbins replied that Bierbaum searched her "everywhere that he possibly can search me," including her socks, shoes, pockets, bra (she explained that she removed her bra underneath her shirt and shook it out in front of Bierbaum to show nothing was hidden), ears and mouth. Robbins stated, "He thoroughly searched me every single time that I've worked with him."

¶ 21 On redirect examination, Robbins testified that she did not bring drugs "into this transaction to set up this Defendant and Shawn Hubbard," and that she received the drugs she gave to Bierbaum from defendant. Robbins stated she did not have her purse with her and left it in the

car.

¶ 22        Detective Kevin Raisbeck testified that he conducted surveillance during the controlled buy. Raisbeck sat in an unmarked car in the parking lot of the Thornton's to observe Robbins and the area. Raisbeck stated he observed Robbins during the 30 minutes she waited before the buy and did not see her speak to anyone or go in the gas station. Raisbeck had a camera and recorded the buy.

¶ 23        The State played Raisbeck's recording for the jury. The video showed a tan Buick enter the parking lot and stop near Robbins. Robbins had a large purse on her arm and a cell phone in her hand. Robbins approached the vehicle on the passenger side and reached in. The driver did not reach over or move toward the passenger side of the vehicle. Robbins removed her arm, the vehicle drove away, and Robbins began walking away from the gas station.

¶ 24        A forensic scientist with the Illinois State Police testified that she conducted testing on the substance and the test was positive for cocaine. Officer Timothy Carlton testified that he participated in surveillance on May 23, 2016. Carlton observed the Buick enter the parking lot of a mobile phone store. When the vehicle left a short time later, Carlton initiated a traffic stop and arrested Hubbard and defendant. Detective Steven Brown stated he searched Hubbard and defendant after the traffic stop. Brown found $40 in Hubbard's wallet and $380 in defendant's pants pocket; $60 was folded together, $100 was folded together, and $220 was folded together. The $40 from Hubbard's wallet and $60 folded together from defendant matched the pre-recorded buy money given to Robbins.

¶ 25        Detective Jared Bierbaum testified that he investigated illegal narcotics. On May 23, 2016, Bierbaum worked with Robbins to perform a controlled buy. Bierbaum stated that he had worked with Robbins on about 30 different cases beginning in 2014.

¶ 26　　　　Bierbaum stated that the target of the buy was Hubbard because Robbins stated he was who she could buy drugs from. Bierbaum put together a surveillance team and briefed them on the plan. Around 5 p.m., Bierbaum took Robbins to a restaurant parking lot across the street from Thornton's in an unmarked car that he searched prior to use. Robbins then contacted Hubbard to arrange a buy. Bierbaum then searched Robbins.

¶ 27　　　　Bierbaum described his search procedures in detail, explaining he searched Robbins's socks, shoes, shirt, pants pockets, mouth, and the seat on which she was sitting. Bierbaum stated, "If she was going to carry a purse, I would have searched her purse. She did not carry a purse in this deal." Bierbaum was looking for any money or drugs and found none. He then gave Robbins $100 in prerecorded buy money and a camera that was designed to look like a cell phone. Robbins exited the unmarked car and walked across the street to the Thornton's.

¶ 28　　　　Bierbaum testified that Robbins left the vehicle at 5:23 p.m. and returned at 6:12 p.m. Bierbaum observed Robbins walk back to his car and she did not meet with anyone along the way. Robbins gave him the camera and a small "corner of this bag *** it's a little knotted plastic baggy," that contained a substance that field tested positive for cocaine.

¶ 29　　　　Bierbaum explained the procedure he followed for measuring the distance from Thornton's to the church and testified the church was 717 feet away.

¶ 30　　　　On cross-examination, Bierbaum acknowledged that he chooses the location of controlled buys and that he had performed other buys with Robbins at the Thornton's. He further testified that he assigned one officer to maintain a surveillance log. That officer listens to radio communications and documents them as requested with a time notation. Bierbaum agreed that he searched Robbins in the restaurant parking lot at 4:58 p.m. and had the search entered into the log. Bierbaum stated he searched Robbins for six minutes before Robbins contacted Hubbard.

¶ 31 Bierbaum acknowledged that Robbins entered the Thornton's at 5:24 p.m. Bierbaum stated she was directed to go inside the Thornton's because she had to use the bathroom and purchase cigarettes. When she returned, Bierbaum searched Robbins again before sending her back out to stand by the Thornton's.

¶ 32 On redirect examination, Bierbaum stated he searched Robbins three times (1) before going into the gas station, (2) after returning from the gas station, and (3) after returning from the buy. Bierbaum stated that Raisbeck was surveilling the parking lot when he instructed Robbins to go to the bathroom and buy cigarettes. Bierbaum further stated that he did not give her the buy money until after she returned from the gas station because he would never permit an informant to use prerecorded buy money to purchase other things.

¶ 33 Defendant did not present any evidence.

¶ 34            3. *Closing Arguments and Verdict*

¶ 35 The State argued in closing as follows:

"Credibility is an issue here, too. *** Somebody who is a drug addict and a convicted felon, should you take what they have to say with a grain of salt? Yes. Now when you evaluate the credibility, take a good look at all the direct evidence and circumstantial evidence that shows what really happened here. Also, as far as that goes, when you are weighing credibility, you all promised us at the beginning that you would treat every witness the same, that you wouldn't believe a police officer because they were a police officer; and, likewise, that you wouldn't discount somebody because they were an addict and had been in trouble before. And I'm asking you to hold to that."

¶ 36 Prior to discussing Robbins's testimony, the State noted that she was a felon, was

- 8 -

on felony probation, and was a drug addict who worked for the police by buying drugs. The State continued that "a reasonable inference" from the evidence was that Hubbard was a "middle man" or "broker." Defendant objected and the trial court overruled the objection. The State asserted that the transaction took so long because Hubbard had to "arrange the transaction" and noted that Hubbard was the driver. Throughout its closing argument, the State continued to refer to Hubbard as "the middle man."

¶ 37        Prior to playing Raisbeck's video during closing, the State argued as follows: "Look at his arm. He's not involved in the transaction other than just being the driver, taking the defendant there to do the deal." After, the State said, "[T]he driver, Sean Hubbard, doesn't lean over because he's the driver, he's the middle man." The State further asserted that Hubbard had $40 of the buy money and defendant had $60. "That's his role for running him around. *** [O]bviously the reason is [defendant] gives $40 to the middle man for his role in the transaction." Defendant objected, arguing no evidence of such an arrangement existed, but the trial court overruled the objection.

¶ 38        The State then argued as follows:

"One thing, too, if you think about it, maybe we got the wrong guy. Maybe the driver's involved. How much money did he have? *** He had 40 bucks. That's it. His cut for being the driver and the middle man. What did he have? He had 380 bucks. Not only did he have 380 bucks, he had $60 of the Bloomington Police Department buy money that was used to purchase this cocaine. And he also had more money that was folded in a similar manner that tells you exactly what happened here and who he is."

¶ 39        Defendant argued Robbins was not trustworthy and that the police permitted too many deviations from the plan to consider the buy "controlled." Essentially, defendant asserted

that Robbins had done so many controlled buys, including ones at Thornton's, that she could have planted the drugs some place, including inside the gas station, prior to contacting the police. Defendant further asserted that the testimony showed that Hubbard made stops before the police pulled him over and, therefore, the $60 could have been given to defendant for any number of reasons.

¶ 40    Regarding the folded money, defendant argued as follows: "The State is grasping at straws trying to imply about folded money meaning you're a drug dealer. It's a far stretch. It's an overreach. Most of us probably have folded money in our pockets right now, doesn't mean we're drug dealers. There's no real corroboration. The money doesn't mean anything."

¶ 41    Defendant also argued that Robbins and Bierbaum had done so many operations together that they could not keep them straight. Defendant pointed out that both testified that Robbins (1) walked back to the restaurant parking lot after the buy and (2) did not have a purse. Defendant played videos for the jury showing Robbins walking in the opposite direction of the restaurant to get to Bierbaum and Robbins carrying a large purse.

¶ 42    On rebuttal, the State argued, "That's the $60 that he had, folded up from the deal, apparently keeping it separate to keep track of the deal. $100 folded together, and $220 folded together." Defendant objected on the grounds that the State was arguing facts not in evidence, and the trial court sustained the objection.

¶ 43    The jury found defendant guilty of delivering a controlled substance within 1000 feet of a church.

¶ 44    4. *Posttrial Proceedings*

¶ 45    Defendant, through counsel, filed a motion for a new trial. In October 2016, the trial court conducted a hearing on defendant's motion for a new trial followed by a sentencing

hearing. After denying defendant's motion, the court sentenced defendant to eight years in prison.

¶ 46        Immediately following the sentencing hearing, defendant's counsel informed the trial court that defendant had given him a handwritten motion that contained the term "ineffective assistance of counsel." Counsel stated the *pro se* motion would ordinarily be stricken per court rules and he was not adopting the motion. The court explained that defendants are not permitted to file *pro se* motions when represented by counsel. Defendant indicated he wished to file the motion, but he would not do so if the court would not accept it. The court did not permit defendant to file the motion and did not address defendant's claims further.

¶ 47        In November 2016, defendant, through counsel, filed a motion to reconsider sentence. The motion did not contain any allegations regarding ineffective assistance, and defendant did not file any *pro se* motions. The trial court denied the motion to reconsider.

¶ 48        B. The Prior Appeal

¶ 49        Defendant appealed, arguing (1) the trial court failed to ensure the jury understood and accepted the Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) principles, (2) the prosecutor committed misconduct during closing argument, (3) the trial court erred by failing to conduct a hearing on his *pro se* claim of ineffective assistance of counsel, and (4) the trial court improperly imposed a drug spinal cord injury fee. *Rhodes*, 2019 IL App (4th) 160917, ¶ 20. We agreed with defendant's third argument and concluded that the trial court should have conducted a *Krankel* hearing. *Id.* Because the outcome of the *Krankel* hearing could have mooted defendant's remaining arguments, we declined to address them and remanded the case for a hearing on his *pro se* claims of ineffective assistance of counsel. *Id.* ¶ 21.

¶ 50        C. Remand

¶ 51        In September 2019, the trial court conducted a *Krankel* hearing. The court

explained this court's ruling, the purpose of the hearing on remand, and the procedure that would be followed. Then the following exchange occurred:

"THE COURT: And are you still wishing to pursue the ineffective assistance of counsel?

THE DEFENDANT: At this point, it's a moot point. I'm 90 days short— I'm less than 90 days short of going home, so it's a moot point at this point.

THE COURT: So, you don't wish to follow through with the ineffective assistance of counsel claim?

THE DEFENDANT: There is no point in bothering with it.

THE COURT: Because I'm prepared today or at another point in time to address those concerns if you had them. And if you do, now is the time to raise them. So, I don't want you to waive anything if your case is looked at again. So, you don't wish to pursue those, correct?

THE DEFENDANT: Not at this time, no."

¶ 52    The trial court then explained to defendant that he had the right to appeal and to pursue the additional claims he raised in his initial appeal. Defendant indicated he wished to continue his appeal, and the court filed a notice of appeal on his behalf.

¶ 53                                II. ANALYSIS

¶ 54    Defendant appeals, arguing (1) the trial court failed to ensure the jury understood and accepted the Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) principles and (2) the prosecutor made an improper closing argument. Defendant acknowledges that he failed to preserve these issues because he did not raise them in a posttrial motion. However, he maintains that this court should excuse his forfeiture and apply plain error review. Because we conclude that the

evidence was not closely balanced, we (1) decline to excuse defendant's forfeiture and (2) affirm the trial court's judgment.

¶ 55                                  A. The Plain-Error Doctrine

¶ 56        The Illinois Supreme Court recently explained the plain-error doctrine as follows:

"A reviewing court will consider unpreserved error when a clear or obvious error occurs and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. [Citations.] When a defendant fails to establish plain error, the result is that his procedural default must be honored." *People v. Jackson*, 2020 IL 124112, ¶ 81.

¶ 57        In *People v. Sebby*, 2017 IL 119445, ¶ 53, 89 N.E.3d 675, the supreme court held that "[i]n determining whether evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case."

¶ 58        B. The Trial Court's Alleged Failure To Comply With Rule 431(b)

¶ 59        In this case, we honor defendant's procedural forfeiture because the evidence was not closely balanced. Although we acknowledge that a defendant need not present conflicting testimony or any evidence at all for a case to be closely balanced, this is not such a case.

¶ 60        Bierbaum and Robbins explained in detail Bierbaum's thorough search to ensure Robbins did not have any drugs prior to the transaction. Although defendant states both Robbins and Bierbaum insisted a purse was not present, both witnesses testified that had a purse been

present it would have been searched. Accordingly, the fact that the videos showed Robbins with a purse has diminished weight. Robbins stated that she handed defendant the controlled buy money and he handed her the crack. The videos corroborate this account, showing that defendant took the money, and nothing indicates Hubbard handed defendant anything. Minutes later, when the police stopped the vehicle, defendant had $60 of the buy money in his pocket. We conclude plain error review is not appropriate.

¶ 61 We note that this issue has needlessly plagued the Appellate Court of Illinois for decades. *People v. Neal*, 2020 IL App (4th) 170869, ¶¶ 191-93, 150 N.E.3d 984. "Needlessly" because avoiding this issue entirely could not be easier. *Id.* ¶ 190. Trial courts' failure to strictly comply is all the more perplexing given the very serious interests at stake. See *id.* ¶ 197 (describing what a prosecutor must say to a victim after a conviction has been reversed, including that retrial may not be possible). Trial courts should strictly adhere to the precise language the Illinois Supreme Court requires in Rule 431(b).

¶ 62 C. Improper Closing Argument

¶ 63 Defendant next argues that the prosecutor made an improper closing argument. We disagree.

¶ 64 1. *The Law of Improper Closing Arguments*

¶ 65 Prosecutors are afforded wide latitude during closing arguments and may properly comment on the evidence presented and reasonable inferences drawn therefrom, "even if the suggested inference reflects negatively on the defendant." *Jackson*, 2020 IL 124112, ¶ 82. However, a prosecutor may not (1) misstate the evidence, (2) argue facts not in evidence, or (3) "make remarks with the sole effect of inflaming the jury's passions or developing its prejudices without casting any light on the issues." *People v. Short*, 2020 IL App (1st) 162168,

¶ 76, 159 N.E.3d 425. When addressing claims of impropriety, reviewing courts consider the argument as a whole, examining the challenged statements in the context of the entire closing statements. *Jackson*, 2020 IL 124112, ¶ 82; *People v. Kallal*, 2019 IL App (4th) 180099, ¶ 35, 129 N.E.3d 621. Improper remarks during closing argument constitute reversible error only "if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error." *Jackson*, 2020 IL 124112, ¶ 83.

¶ 66                                    2. *This Case*

¶ 67        The arguments defendant alleges to be improper are all reasonable inferences to be drawn from the evidence. The State's theory that Hubbard was a "middle man" was a reasonable inference from Robbins's testimony. Robbins stated she knew Hubbard and that she arranged to purchase crack from Hubbard. Hubbard was delayed for 30 minutes, and when he arrived, defendant, a man Robbins had never seen, was in the passenger seat, took the money, and handed her the crack. Both Hubbard and defendant had buy money when they were arrested, with Hubbard having $40 to defendant's $60. This context supports the State's argument in closing that Hubbard needed that time to arrange the transaction between the dealer (defendant) and the buyer (Robbins) and the money was unevenly split to account for the difference in roles.

¶ 68        Defendant further contends that the State improperly implied that defendant had committed other drug deals because the $60 in buy money was folded together but separate from two other sets of bills similarly folded together. We agree that no testimony was presented regarding the significance, if any, of having multiple sets of currency folded together. But, the trial court sustained defendant's objection to this argument in rebuttal and properly instructed the jury that closing arguments are not evidence. See *Kallal*, 2019 IL App (4th) 180099, ¶ 35 (Erroneous statements may be cured by telling the jury arguments are not evidence and should be

disregarded if unsupported or by sustaining an objection.). Accordingly, defendant has already received his remedy.

¶ 69　　　Finally, the State's comment that the jury had "promised" to consider the testimony of a drug addict the same as any other witness was not prejudicial. Again, the trial court properly instructed the jury about how to consider closing arguments and evaluate witness testimony. *Id.* The State's comment, when viewed in context of its entire closing, did not overcome those instructions. Although inartful, the State was clearly attempting to tell the jury to consider all relevant information when evaluating witness testimony, which is why it also told the jury it had "promised" not to believe the testimony of a police officer merely because that person was a police officer. Nothing in the record suggests the jury ignored the considerable impeachment evidence against Robbins, much of which was conceded by the State throughout the trial and in closing arguments.

¶ 70　　　　　　　　　　　III. CONCLUSION

¶ 71　　　For the reasons stated, we affirm the trial court's judgment.

¶ 72　　　Affirmed.