NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 190523-U

NO. 4-19-0523

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 29, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee | ) | Circuit Court of |
| v. | ) | Livingston County |
| JONATHAN A. CHAMBERS, | ) | No. 17CF107 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht, |
| | ) | Judge Presiding. |

_____

JUSTICE KNECHT delivered the judgment of the court.
Justices Turner and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held:*   Defendant's *pro se* postconviction petition states the gist of a constitutional claim
he was denied due process and the effective assistance of counsel when
the prosecutor made arguably improper remarks during closing argument and
defense counsel failed to object.

¶ 2    Defendant, Jonathan A. Chambers, appeals the summary dismissal of his petition

filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)).

Defendant argues his postconviction petition asserts the gist of a constitutional claim. We agree

and reverse and remand for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4    In April 2017, the State alleged defendant committed multiple offenses when he

indirectly contacted Jamie Ware with the intent to deter her from testifying against him at his

trial for unlawful delivery of a controlled substance (Livingston County case No. 16-CF-299).

The alleged offenses were harassment of a witness (720 ILCS 5/32-4a(a)(2) (West 2016)),

bribery (720 ILCS 5/33-1(a) (West 2016)), and communication with a witness (*id.* § 32-4(b)).

¶ 5        Approximately seven months later, the State amended the charges against defendant. The State dropped the charges for bribery and harassment of a witness and added a charge of attempted harassment of a witness (*id.* §§ 8-4(a), 32-4a(a)(2)). For the newly added attempt charge, the State alleged defendant, with the intent to commit the offense of harassment of a witness, "performed a substantial step toward the commission of that offense" by communicating with "Shad Hamilton to discuss his case with Jamie Ware." Defendant's trial proceeded only on the charge of attempted harassment of a witness.

¶ 6        At defendant's January 2018 jury trial, two witnesses testified for the State: defendant's friend, Shad Hamilton, and Brian Maier, an officer with the Dwight Police Department. In addition to the testimony of those witnesses, the State introduced four recordings of telephone conversations between Hamilton and defendant, who was incarcerated.

¶ 7        Hamilton testified he had known defendant for probably 25 or 30 years. While defendant was incarcerated in the Livingston County jail in January and February 2017, Hamilton and defendant had spoken over the phone. Hamilton listened to the recordings of his conversations with defendant and agreed the recordings accurately and fairly depicted those conversations.

¶ 8        During Hamilton's testimony, the State played the recordings of those telephone conversations. In the first call, which occurred on January 25, 2017, defendant asked Hamilton, "[A]m I good, bro? Like, like I gotta speak in code so you know. Like remember when we [were] in Mt. Sterling, what I did for you, right?" Hamilton said he did. Defendant repeated, "Am I good?" Hamilton asked defendant if he knew "who it was," to which defendant replied, "yeah, I already know. J.W." Defendant asked a third time, "Am I good though?" Hamilton

- 2 -

replied, "Yeah, I think so. She's going to treatment so she's not gonna be there. She probably won't be there for the—for the trial, you know. She feels bad. You're her friend, man." Defendant replied that he "loved [Ware] to death, bro, like that's my sister." Hamilton said, "[Y]ou know she feels bad about the whole situ—. I'm not—I don't fuck with her right now; I'm not talking to her at all." Defendant interrupted, "[B]ut I need you to though. I need you [to] though. *** Don't just brush her away, like, make sure, like you know." Hamilton said he did not think Ware was coming to defendant's trial because she did not want to testify "in the first place." Hamilton "honestly did not believe" Ware would go to court. Hamilton also said he did not think the State had a case against defendant if Ware did not testify; defendant agreed. Hamilton further stated he thought Ware had "too much pride" to testify against defendant. Defendant told Hamilton he would "hit [him] on a different line." Defendant said, "If I'm good, I'm good, you know what I'm saying. I won't sweat it." Hamilton told defendant he would let him know. Hamilton asked if defendant had been offered a deal yet. Defendant responded he had not.

¶ 9       The second phone call between Hamilton and defendant occurred on January 30, 2017. Defendant asked Hamilton if Hamilton had talked to Ware. Hamilton replied he had not. Hamilton replied he had someone else in mind to talk to her. Hamilton explained he attempted to get in contact with Ware that weekend, but Ware knew Hamilton was "mad at her for what she did though." Hamilton further said he knew Ware was going to church on Sunday and Hamilton was going to have someone "work on it." Hamilton said he "honestly believe[d]" Ware would not testify against defendant, as she said from the beginning she would not testify. Defendant said, "I hope that's right because I'm going to take it all—I'm going to take it all the all the way if she's not. I hope she don't because you know I love her. I look at her like a sister, bro."

Defendant continued, stating he was not angry with Ware. Hamilton replied, "This is some fucked up shit, man. I know—I know exactly how you feel. I've been through the same shit." Hamilton told defendant to call him later that week for more information.

¶ 10　　　　　The third call occurred on February 4, 2017. Defendant asked Hamilton if everything was "good." Hamilton replied that it was: "Yeah, you're good. Just keep in touch with me *** I'll keep you updated."

¶ 11　　　　　Three weeks later, the fourth recorded call occurred. Defendant called Hamilton from a different line. Hamilton said he had spoken to that one person, "and take it all the way, you're good." Defendant thanked Hamilton.

¶ 12　　　　　Hamilton testified he and defendant were at "Mt. Sterling" together. Defendant was friends with a person Hamilton's "charges were against." Defendant told Hamilton he would talk to that individual on Hamilton's behalf and that individual would not be present to testify against Hamilton. When defendant asked during the phone conversation if Hamilton remembered Mt. Sterling, Hamilton stated that situation came to his mind.

¶ 13　　　　　Hamilton acknowledged he spoke to Ware about her testimony. Hamilton, who had previously been to rehab, stated he believed when a person is in rehab, that person could not be forced to testify. Hamilton explained the facility could not "confirm or deny that you are [at the rehab facility] unless you give consent." Hamilton denied overtly threatening Ware. Before defendant faced the drug charges, Hamilton attempted to get Ware into treatment. He knew Ware had been in some legal trouble, and he wanted to get help for her and her baby.

¶ 14　　　　　On cross-examination, Hamilton testified the suggestion Ware go to rehab was his own idea.

¶ 15　　　　　Officer Maier testified he was a narcotics investigator with the Livingston County

Proactive Unit. As part of this role, Officer Maier worked with undercover sources. Ware was an undercover source and "a chief witness" in a controlled-substance case against defendant (Livingston County case No. 16-CF-299). During January and February 2017, defendant was incarcerated on the controlled-substance charges. Officer Maier listened to recordings of the telephone conversations between Hamilton and defendant that involved Ware. The following colloquy occurred, during which an objection was made after the State used the word "help:"

"[THE STATE]: Did you speak with [Ware] about the recordings?

A. Yes.

Q. She had come to you regarding help for what was happening?

A. Correct.

[DEFENSE COUNSEL]: Objection.

THE COURT: Hold on. What was the objection?

[DEFENSE COUNSEL]: Hearsay regarding help.

THE COURT: That's not a hearsay statement. Overruled. The jury can consider.

[THE STATE]: Thank you, Judge.

Q. And without saying anything that she told you, you gave her help with the situation. Correct?

A. Correct.

Q. And investigated it, as far as getting the phone calls to my office?

- 5 -

A. Correct.”

¶ 16    During closing argument, defense counsel argued the following:

“It’s not enough for the State to say [defendant] asked Mr. Hamilton to go talk to the witness. They have got to show more. They have to show, number one, that his intent was to harass or annoy Jamie Ware. There’s been no showing whatsoever that anything was intended to harass or annoy her. There’s been no showing that she actually was harassed or annoyed. And it’s got to be not just a little bit of harassment. It’s got to be so much so that it’s done in a way, in such a manner as to produce mental anguish or emotional distress.

I listened to the audio, too. I would urge you to listen to it. There’s nothing in there where [defendant’s] asking Mr. Hamilton to produce some kind of mental anguish or emotional distress. It just is not there. He never asked Mr. Hamilton to, you know, take her out and beat her up. Never asked him to, you know, threaten her in any fashion. It just is not there ***.”

¶ 17    The State, in rebuttal closing argument, referenced the “help” testimony:

“And as far as harassment, Jamie Ware sought out the help of law enforcement after the conversation. As far as her emotional distress, she sought out the help and received from Officer Maier assistance in this. She’s not even in the area anymore.

So as far as evidence of what exactly transpired with Jamie

Ware and this harassment that the defense says isn't there, I think you have everything you need to find that it is. \*\*\*

The situation clearly put her in a situation where she was uncomfortable. Situation where she knew I'm going to be getting, there's going to be stuff going on if I don't avoid testifying in court."

¶ 18 During deliberations, the jury asked the trial court, "Can you verify that the officer testified that Jamie Ware contacted Officer Maier after all of the phone recordings?" The court ordered the jury be provided with the transcript of Officer Maier's testimony.

¶ 19 Defendant was found guilty and sentenced to eight years' imprisonment, to be served consecutively to the five-year concurrent sentences received in Livingston County case Nos. 16-CF-299 and 16-CF-298. After his posttrial motions were denied, defendant pursued a direct appeal of his attempt conviction (case No. 4-18-0342), arguing, in part, he was entitled to a hearing under *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984).

¶ 20 Before defendant's direct appeal from his conviction was resolved, defendant filed, in February 2019, a *pro se* petition under the Act. In his postconviction petition, defendant asserted multiple claims of constitutional error, including arguing he was denied his sixth-amendment right to confront witnesses against him when the State's use of the word "help" was allowed at trial. See U.S. Const., amend. VI. Defendant further emphasized the jury's question during deliberations that focused on that testimony. Attached to his petition is a copy of a March 14, 2017, "Supplemental Narrative" by Officer Maier. The "Supplemental Narrative" states the following, in part:

"The following is an ongoing investigation that resulted in

multiple phone calls made by [defendant] to a Shad Hamilton from the Livingston County Jail. The phone calls were made on four separate dates (01/25/17, 01/30/17, 02/04/17, and 02/25/17). These phone calls were investigated because on 03/12/17 CS#0013-16 made contact with me regarding (Shad Hamilton) making contact with the CS. CS stated Shad was trying to get him/her to either plead the fifth or not testify at all on [defendant's] case coming up in the near future. CS stated to me Shad offered him/her rehab and offered to pay for an attorney if he/she did not testify. CS provided me the phone number of Shad's that was used to contact the CS. The phone number [(redacted)] was then used and linked to phone number [defendant] had called while in custody in the Livingston County Jail."

¶ 21 In May 2019, the trial court summarily dismissed defendant's postconviction petition, finding it frivolous and patently without merit. Defendant appealed the dismissal of his postconviction petition (case No. 4-19-0523).

¶ 22 Both the direct appeal and the appeal from the postconviction petition were consolidated for our review. However, after we concluded in the direct appeal (case No. 4-18-0342) the case must be remanded for a *Krankel* inquiry (*People v. Chambers*, 2021 IL App (4th) 180342-U, ¶ 2), we concluded it would be premature to rule on case No. 4-19-0523 until the resolution of the *Krankel* hearing, and we severed the appeals (*id.* ¶¶ 20, 22).

¶ 23 In June 2021, the trial court held the *Krankel* inquiry on remand from case No. 4-18-0342 and concluded defendant had not shown he was denied the effective assistance of trial

counsel. The *Krankel* inquiry did not address the issue raised in this appeal (case No. 4-19-0523). This court, in July 2021, recalled case No. 4-19-0523. A new briefing schedule was set. This appeal of the dismissal of his postconviction petition followed.

¶ 24                                    II. ANALYSIS

¶ 25            On appeal, defendant argues the summary dismissal of his postconviction petition was improper as his petition states the gist of a constitutional claim. Specifically, although framing his argument on appeal as one of testimonial hearsay, defendant takes issue with the State's use of Officer Maier's agreement Ware needed "help." Defendant further emphasizes the jury's reliance on that "fact" during deliberations on the charge of attempted harassment.

¶ 26            The Act provides defendants the means to obtain postconviction review of claims their convictions led to a substantial denial of their constitutional rights through a three-stage process. *People v. Jones,* 213 Ill. 2d 498, 503, 821 N.E.2d 1093, 1096 (2004). The process is initiated by a defendant's filing of a postconviction petition. See *People v. Brown*, 236 Ill. 2d 175, 184, 923 N.E.2d 748, 754 (2010). At the first stage of the process, the trial court examines the petition and determines whether the claims within the petition are frivolous or patently without merit. See *People v. Andrews*, 403 Ill. App. 3d 654, 658-59, 936 N.E.2d 648, 652 (2010). The threshold for a petitioner at this first stage is low; the petitioner need only state the gist of a constitutional claim by pleading facts sufficient "to assert an arguably constitutional claim." *Brown*, 236 Ill. 2d at 184. If the court finds the petition frivolous and patently without merit, it must dismiss the petition. 725 ILCS 5/122-2.1(a)(2) (West 2018). This case involves a first-stage dismissal of defendant's postconviction petition, meaning our review is *de novo*. *People v. Couch*, 2012 IL App (4th) 100234, ¶ 13, 970 N.E.2d 1270; see *People v. Leach*, 2012 IL 111534, ¶ 64, 980 N.E.2d 570 ("Our review is *de novo* because a defendant's claim that his

sixth amendment right to confront a witness against him was violated presents a question of law.").

¶ 27        The constitutional rights defendant asserts he was denied in his postconviction claim are his right to due process of law and his right to the effective assistance of counsel. See *People v. Domagala*, 2013 IL 113688, ¶ 36, 987 N.E.2d 767 (quoting U.S. Const., amends. VI, XIV) (showing criminal defendants have the right to effective assistance of counsel). To prove his ineffectiveness claim was improperly dismissed as frivolous or patently without merit, defendant's petition must show both "(i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *People v. Hodges*, 234 Ill. 2d 1, 17, 912 N.E.2d 1204, 1212 (2009).

¶ 28        The State used the brief statement by Officer Maier regarding Ware coming to him for "help" in its rebuttal closing argument. In closing argument, prosecutors have wide latitude and may argue facts and any reasonable inferences arising from the evidence. *People v. Kallal*, 2019 IL App (4th) 180099, ¶ 35, 129 N.E.3d 621. When a challenge is made to a prosecutor's remarks, we consider those remarks in the context of the parties' entire closing arguments. *Id*. Only when improper closing remarks cause substantial prejudice to the defendant will we find reversible error. *Id.* A new trial should be granted if "the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction." *People v. Wheeler*, 226 Ill. 2d 92, 123, 871 N.E.2d 728, 745 (2007).

¶ 29        We find defendant's postconviction petition states the gist of a constitutional claim as he has pled facts sufficient "to assert an arguably constitutional claim" (*Brown*, 236 Ill. 2d at 184). The only evidence presented by the State on Ware's state of mind was Officer

Maier's affirmation Ware came to him for "help." The State argued during rebuttal closing argument Ware was "distressed" by what was occurring, thereby introducing a fact not in evidence. The State said: "As far as her emotional distress, she sought out the help and received from Officer Maier assistance in this. *She's not even in the area anymore*." (Emphasis added.) The jury later asked a question regarding that conversation. Whether Ware suffered any distress by communicating with Hamilton is arguably irrelevant to the attempt charge. Defendant was charged with attempted harassment. Attempt is committed when, "*with intent to commit a specific offense*, [the offender] does any act that constitutes a substantial step toward the commission of that offense." (Emphasis added.) 720 ILCS 5/8-4(a) (West 2016). Harassment of a witness, on the other hand, requires proof of actual mental anguish or emotional distress:

> "(a) A person who, with intent to harass or annoy one who *** is
>
> serving *** (2) as a witness, or who may be expected to serve as a
>
> witness in a pending legal proceeding *** communicates directly
>
> or indirectly with the *** person who may be expected *** to
>
> serve as a witness *** in such manner as to produce mental
>
> anguish or emotional distress ***." *Id.* § 32-4a(a)(2).

¶ 30    The State, in rebuttal argument, used a response to a question verifying Ware came to the officer for "help," which was introduced to explain the officer's investigative steps, as proof of "actual distress" on the part of Ware, which is arguably irrelevant. Given the jury's question, it is arguable "the prosecutor's improper remarks *** contribute[d] to the defendant's conviction" and it may be a new trial is, therefore, warranted. *Wheeler*, 226 Ill. 2d at 123. On remand, defendant, with the aid of counsel, is not precluded from developing and clarifying the issue.

¶ 31    The arguable constitutional violations include not only a due-process violation but also the denial of defendant's right to effective assistance of counsel. For example, defense counsel's failure to object to the State's introduction of a fact not in evidence and the emphasis on Ware's level of distress arguably amounts to objectively unreasonable representation. *Hodges*, 234 Ill. 2d at 17. In addition, given the jury's question during deliberations, had the failure not occurred, there is arguably a reasonable probability the outcome of the trial would have been different. See *Strickland v. Washington*, 466 U.S. 668, 694 (1984) (showing the prejudice prong of the ineffectiveness-of-counsel test requires proof "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").

¶ 32                                III. CONCLUSION

¶ 33    We reverse the trial court's judgment and remand for further proceedings.

¶ 34    Reversed and remanded.